DECISION
Plaintiff appeals Deschutes County Board of Property Tax Appeals Real Property Order, dated March 16, 2009, for the Riverhouse Convention Center (subject property) identified as Account 101068. A trial was held on April 8, 2010, in the Oregon Tax Court courtroom, Salem, Oregon. Neil R. Bryant, Attorney at Law, appeared on behalf of Plaintiff. Wayne Purcell (Purcell), Plaintiffs managing member, and Todd Liebow (Plaintiffs appraiser), Certified Appraiser and MAI, testified on behalf of Plaintiff. Laurie Craghead, Deschutes County Counsel, appeared on behalf of Defendant. Sharra Tisiot (Defendant's appraiser), Oregon Registered Appraiser, testified on behalf of Defendant.
Plaintiffs Exhibits 1, 2 and 3 and Defendant's Exhibit A were offered and received without objection.
Plaintiffs Amended Complaint, filed March 25, 2010, to request the 2008-09 real market value supported by its evidence was discussed. Defendant's Amended Answer was filed March 29, 2010.
 I. STATEMENT OF FACTS
The parties submitted stipulated facts at trial. In 1980, "a master plan for a hotel/resort complex that included plans for the hotel units, a pro-shop, a convention center, a recreation *Page 2 
center, golf course, and residential units, including condominium units" was approved by the City of Bend (City). (Stip Facts ¶ 14.) In 2004, a development agreement, incorporating "Ordinance No NS-1951" and the "Findings and Conditions" for that ordinance was finalized and required that the convention center be built before any other structures. (Def's Ex A at 60 — 246, 238.) Purcell testified that the negotiated agreement included (1) an acknowledgement by the City of the importance of the convention center to the community; (2) the City's interpretation that a convention center is an allowable activity in a commercial limited (CL) zone; (3) requirements that the property owner grant trail easements, build a paved pedestrian bridge between the subject property and The Riverhouse Hotel (Hotel), and protect the riverfront (referred to as the water overlay zone); and (4) permission for the constructed building to have a sloping roof and height in excess of existing restrictions. (Def's Ex A at 60 — 246.) The subject property, a privately funded two-story 30,738 square foot convention center, was completed in 2006. (Stip Facts ¶¶ 8, 11.)
The subject property is located on 6.62 acres situated between Highway 97 and the Deschutes River in Bend, Oregon. (Stip Facts ¶¶ 6, 10.) Plaintiff's appraiser expressed concern that the subject property is negatively impacted by the Highway 97 Parkway that permits Mount Hood traffic to bypass the subject property.
The subject property is described as a "state-of-the-art building" which can "accommodate very large conferences with concurrent meetings, meals, tradeshows and breakout sessions." (Def's Ex A at 27.)
 "The first floor ballroom is 16,000+ sq.ft. and can be divided into up to 10 different rooms. The ballroom is able to seat approximately 1,000 people for a sit-down meal. The lower floor (right along the river), offers an additional 13,000+ sq. ft. of exhibit space." *Page 3 
(Id.) Purcell described the upper floor as "modern Central Oregon architecture" with slate tile flooring, two-story water feature and fireplace, and a "homey feel" in the bathrooms. In addition to 56 on-site parking spaces, the subject property shares 104 parking spaces with the adjacent Hotel parking lot. (Stip Facts ¶ 9.)
Purcell testified that the upper floor of the subject property opened in December 2006, and the subject property "officially" opened as a "full facility" in February 2007. He testified that the "2007 gross revenue" was approximately "$1,770,000." Purcell testified that the subject property shares accounting, marketing, and other personnel with the Hotel, which he manages. He testified that the "new point of sale system" may not have accurately charged the shared costs to the "entity" in 2007. Purcell testified that the "2008 gross revenue" was "$1,900,000" and after expenses the "net income was $384,000," and "2009 gross revenue" was "$1,606,000" and after expenses the "net income before debt service" was "$218,000."
Purcell testified that the "typical rental" of the first floor ballroom is a "portion of the building and a portion of a day." He testified that he estimated "five tradeshows per year" are held in the lower floor, which has concrete flooring and an open black painted beam ceiling. Purcell testified that "for the first time on April 16, 2010," the subject property will host a tradeshow that should fill the "1,000 to 1,200 capacity." Purcell testified that his main competitors are the "Deschutes County Fairground, especially for tradeshows; Eagle Crest; Sunriver; Mt. Bachelor; and the Shilo." He testified that the subject property was built to "help preserve" the Hotel business which has been reduced "year after year" since the opening of the Bend Parkway, construction of new hotels and motels including the Holiday Inn, and the increased availability of "other meeting spaces." *Page 4 
The parties agree that the highest and best use (as improved) of the subject property is a convention center. Each appraiser evaluated the legal, physical, and financial, including location and market, considerations. (Ptf s Ex 1 at 44; Def s Ex A at 15.) Plaintiffs appraiser concluded that "because of the restrictions placed on the site by the Development Agreement, the subject site as-vacant would need to be developed with a convention center" even though he concludes that it is not "financially feasible" and "[t]his type of property is typically publicly owned for the benefit of the community." (Ptf s Ex 1 at 43, 44.) Defendant's appraiser concluded "that the highest and best use of the land, if vacant, is for development of its current use as a convention center inassemblage with the Riverhouse Resort Hotel.
(Def s Ex A at 15.) (Emphasis added.)
Both Plaintiffs appraiser and Defendant's appraiser agreed that, of the three approaches to value the comparable sales approach is not applicable to the subject property, primarily because there are few if any privately owned convention center properties that could serve as comparable properties.[1]
A. Cost Approach
Both appraisers, who each personally inspected the subject property, determined value using the cost approach, but Plaintiffs appraiser gave little if any weight to that approach.[2] In determining the land real market value, Plaintiffs appraiser identified five land sales of commercial property located in the Bend area. (Ptf s Ex 1 at 50 — 53.) The sales closed between December 2006 and February 2008. (Id.) "The comparables indicate[d] an adjusted range of prices between $14.35/SF and $31.02/SF, and [an] average [of] $22.59/SF." (Id. at 53.) Those *Page 5 
land sales ranged in size from 1.11 acres to 6.51 acres. (Id. at 52 — 53.) After concluding that some of the land sales, specifically sales 1, 2 and 3, were not "reasonable substitutes for the subject property," Plaintiffs appraiser concluded that "the subject has slightly inferior access and exposure relative to the comparables," resulting in "a unit value of $21/SF" for the subject property's land value, or $4,790,000. (Id.)
Defendant's appraiser testified that she researched the "Deschutes County Assessor's real estate records" and identified ten "commercial zoned vacant land sales in the Bend general market area since 2005." (Def s Ex A at 18.) Those land sales ranged in price from $19.35 to $52.03 per square foot and ranged in size from .16 acres to 6.45 acres. (Id.) Defendant's appraiser concluded that the land's "indicated market value" was $30 per square foot or $8,631,790. (Id.) Plaintiffs appraiser questioned Defendant's appraiser's choice of land sales as comparable to the subject property given the small size of some of the parcels chosen and the "constraints placed on the subject property." Both appraisers selected a 6.51 acre parcel located at 61260 Highway 97 that closed on December 21, 2006, with a less than $20 per square foot adjusted sale price as comparable to the subject property.[3] (Ptf s Ex 1 at 18; Def s Ex A at 50.)
Using two sources, "Marshall Valuation Service and the subject's cost schedule," Plaintiffs appraiser stated that the "estimated cost to construct a similar facility" would be $10,522,112 or $197.49 per square foot. (Ptf s Ex 1 at 54 — 55.) Plaintiffs appraiser presented the "developer's cost" of $11,940,637 or $224.12 per square foot, stating that "the developer's estimate is considered a high indicator because of the high site improvement costs connected to the subject's site and because of the very high expense for owner equipment." (Id. at 56.) He stated that "[f]or owner-user, or built to suit properties entrepreneurial profit is not an appropriate consideration; rather, for this analysis, an allowance of 5% of land and improvements is *Page 6 
concluded. This reflects an overhead allocation only (owner's overhead), which is typically incurred by owner-users." (Id.) Plaintiffs appraiser concluded that a physical depreciation deduction of 6.7 percent was applicable, resulting in a depreciated replacement cost of $10,666,021. (Id. at 58.) Plaintiffs appraiser's land and improvement value indication by the cost approach was rounded to $15,460,000 or $290.18 per square foot." (Id.)
Using "[c]ost [d]ata by Marshall Swift," Defendant's appraiser determined an improvement cost (rounded) of $9,919,000 and a total "indicated market value using the cost approach" of $18,580,000. (Def s Ex A at 18 — 20.) Defendant's appraiser wrote in her appraisal report that "[a] market derived entrepreneurial incentive of 12% was added within the cost approach. * * * It is the difference between the cost of a project and the market value of a property after completion and achievement of stabilized occupancy." (Def s Ex A at 17.)
B. Income Approach
Plaintiffs appraiser concludes that the income approach "is a good and accurate measure of the value of income-producing properties" like the subject property. (Ptf s Ex 1 at 59.) Similarly, Defendant's appraiser describes the income approach as "[t]he most common methodology applicable to commercial real estate involving the estimation of rents and expenses for the subject property and the capitalization of the resulting net operating income at a market rate." (Def s Ex A at 22.) Both appraisers agree that, given the construction completion date, the subject property's income was not stabilized as of the assessment date. (Ptf s Ex 1 at 72; Defs Ex A at 22.)
The first step in the income approach is to compute gross rent. Plaintiffs appraiser testified that he reviewed five convention center facilities, concluding that the property most comparable to the subject property considering "age, size, quality and condition" was the Salem *Page 7 
Convention Center, Salem, Oregon. (Ptf's Ex 1 at 66.) Plaintiff's appraiser concluded "$3 million for the subject's gross rent" per year. (Id.) "Because the income conclusion is based on gross sales that rise and fall with changes in occupancy, the gross rent conclusion has the vacancy built into it and no additional deduction is warranted." (Id.) Plaintiff's appraiser testified that it will take longer for the subject property's gross income "to stabilize" because of the recession.
Defendant's appraiser stated that, "[a]ccording to Expo Web, as of 2005 smaller facilities (less than 100,000 sf) an average rent of $0.97 per square foot for trade shows and $0.77 for consumer shows was being charged," and she "used $0.87 per square foot for 30,000 square feet of rentable space." (Def's Ex A at22.) Defendant's appraiser further stated that the Expo Web "occupancy rate average was 42.7% for the same size facility" and 38 percent "[a]ccording to PricewaterhouseCoopers annual survey of North American convention centers * * * for 2005 to 2006." (Id.) She "used a 40% occupancy rate." (Id.) In response to questions, Defendant's appraiser testified that she was unable to find data reported later than 2005 and she did not consider data from other convention centers within or without the state. In arriving at the rate of 87 cents per square foot, Defendant's appraiser testified that it was a "blended" rate, acknowledging a "lower floor" rate of 9 cents per square foot. Plaintiff alleged that, given the rental rates per floor selected by Defendant's appraiser, the correct effective gross rent should be $2,216,280.[4] *Page 8 
The second step in the income approach is to estimate expenses. Plaintiff's appraiser testified that his expenses analysis placed significant weight on the subject property's 2008 operating expenses. (See Ptf's Ex A at 69.) He estimated fixed expenses for the subject property using "the IACC national average" for management fee and other fixed charges including insurance. (Id.) Plaintiff's appraiser's property tax estimate is "based on the subject's current taxes." (Id.) In computing a 5 percent reserve, Plaintiff's appraiser explained that the amount is "based on 5% of EGI, which is budgeted by the subject for 2009. This is higher than for a typical commercial property, but it takes into account the very high level of AV and other technological aspects of the subject."[5] (Id.) Plaintiff's appraiser's expense ratio was 94 percent. (Id.) Defendant's appraiser testified that a 94 percent expense ratio is high compared to studies she consulted and reviewed. Defendant's appraiser estimated expenses "at 70% based on the 2008 Smith Travel Host Study for Full Service Hotels." (Def's Ex A at 22.) She did not include property taxes among her estimated expenses.
The final step in the income approach prior to determining an estimated value is to compute a capitalization rate that is applied to the net income, which is gross rental income less expenses. Plaintiff's appraiser stated that "a capitalization rate for the subject is analyzed based on market extraction, Band of Investments analysis and the Korpacz Real Estate InvestorSurvey." (Ptf's Ex 1 at 70.) He relied on five "recent sales of hotels in competing markets for the subject" because "hotels have similar risk characteristics and are believed to be affected by changes in the economy in a similar manner to how conference centers are affected." (Id.) "The capitalization rates of the comparables range from 8.9% to 10.3%, and average 9.7%." (Id.) Plaintiff's appraiser concluded that "a capitalization rate of 10% is indicated by the *Page 9 
comparables." (Id.) Defendant's appraiser "derived" a capitalization rate of "9%" from "the PKF Consulting 2008 Hospitality Investment Survey of Full-Service Hotels. (Def's Ex A at 22.) That capitalization rate was also supported by hotel sales throughout Oregon." (Id.) She further stated that a .69 percent tax rate was added to the 9 percent capitalization rate "for an overall rate of 9.69%." (Id.)
C. Indicated Value
To determine an indicated value, the appraisers applied a capitalization rate to the computed net operating income. Plaintiff's appraiser computed a net operating income of $381,752 and applied the 10 percent capitalization rate to compute "a going concern value that includes real property, furniture, fixture equipment, and intangible business value" of $3,817,523. (Ptf's Ex 1 at 74.) Plaintiff's appraiser explained that, given "the lack of available market data, it is very difficult to estimate how the subject will ramp up to full occupancy." (Id. at 73.) He computed a "shortfall or difference between the two NOIs," the subject property's NOI compared to the "estimated NOI that the subject is actually able to achieve." (Id.) After concluding that the subject property's net operating income will be stabilized by the fourth year, Plaintiff's appraiser computed "[t]he net present value of the total shortfall" and identified it as an "estimated absorption cost" ($492,014). (Id.) The estimated absorption cost was subtracted from the going concern value and labeled "As-is Market Value, $3,330,000." (Id. at 74.)
Defendant's appraiser testified that Plaintiff has overstated the impact of the recession on commercial property like the subject property. She testified that the effects of the recession were not evident in the Bend area until the first quarter of 2009. Defendant's appraiser testified that she concluded the subject property has no "economic or physical obsolescence" because there is "no problem associated with the subject property." Defendant's appraiser applied a *Page 10 
capitalization rate of 9.69 percent to a net operating income of $1,143,180 to determine the "Total Value by Income Approach" of $11,797,523. (Def's Ex A at 22, 23.) Defendant's appraiser's Total Value by Income Approach was reduced by the value of the personal property ($1,462,000) to arrive at a "Total Land and Improvement" value of $10,335,000 (rounded). (Id. at 23.) She noted that "[t]his value would assume that the subject is a stand alone facility." (Id. at 22.) After reciting applicable pages of the "Approval of a Development Agreement" and stating that the marketing of the facility is "The Riverhouse Resort, Hotel Convention Center, * * * a `full service facility'," Defendant's appraiser stated that "[t]he entire facility would need to be reviewed in order to provide a complete income approach." (Id.)
Plaintiff's appraiser's Analysis of Value Conclusions states that "the Income Capitalization Approach is given full emphasis in the determination of value." (Ptf's Ex 1 at 75.) He concludes that the real market value of the subject property as of the assessment date was:
 Land: $1,309,000
 Improvement $ 561,000
 Personal Property: $1,460,000[6] (not appealed; separate tax account)
Total As-Is Market Value: $3,330,000

(Ptf's Ex at 1; Parties' Position Statements.)
Like Plaintiff's appraiser, Defendant's appraiser noted that there is "a considerable difference between the cost and income approach." (Def's Ex A at 25.) She repeated her concern "if in fact the income could even be considered as a stand alone facility." (Id.) Defendant's appraiser opined that "the value concluded by the 2008 Board of Property Tax Appeals of $12,262,190, which was not disputed by the assessor's office, appears to be bracketed by the applicable approaches to value." (Id.) In her "Summation of all Real Property," *Page 11 
Defendant's appraiser stated that the "aggregated real market values for the improved real property account as of January 1, 2008, are allocated as follows:
 Land $8,631,790
 Improvements $3,630,400
Deschutes County Account #101068 — Total $12,262,190

(Id . at 25.)
 II. ANALYSIS
The issue before the court is the real market value of Plaintiff s property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v.Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [7] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to be inapplicable. See ORS 308.205(2); OAR150-308.205-(A)(2). Even though each party used the cost approach, both parties put the greatest weight on the income approach.
B. Highest and Best Use
Prior to reviewing the parties' approaches to valuation, the highest and best use of the subject property must be considered. Both parties agree that the current use of the subject property as a convention center is legally permissible because the property owner and City of *Page 12 
Bend signed a Development Agreement. Plaintiffs appraiser concluded that if the Development Agreement did not exist, "a conference center would not be the subject's highest and best use." (Ptf s Ex 1 at 75.) Defendant's appraiser concluded "that the highest and best use of the land, if vacant, is for development of its current use as a convention center in assemblage with the Riverhouse Resort Hotel." (Def s Ex A at15.) Assemblage is defined as "[t]he combining of two or more parcels, usually but not necessarily contiguous, into one ownership or use." Appraisal Institute, Dictionary of Real Estate Appraisal
19 (4th ed 2002). The subject property's owners and the Riverhouse Resort Hotel's owners are the same, but the uses are different. Defendant's appraiser's ultimate determination of value is influenced by her belief that the subject property's value is appreciably influenced by the adjoining property, Riverhouse Resort Hotel. However, she did not submit evidence to quantify the increment of value created by combining those two parcels to produce greater utility or value. That increment of value is commonly referred to as plottage. Id. at 214.
Both parties agree that the highest and best use of the subject property as improved is a convention center. (Ptf s Ex 1 at 44; Def s Ex A at 16.)
C. Cost approach
Both appraisers valued the subject property using the cost approach. To determine the land real market value, Plaintiffs appraiser selected five land sales and Defendant's appraiser selected ten land sales. (Ptf s Ex 1 at 50; Def s Ex A at 18.) All land sales were in the Bend area. The sale dates of Defendant's land sales ranged from 2005 to 2007 and the dates of Plaintiffs land sales ranged from December 2006 to February 2008. Only one of the land sales identified by the appraisers was of comparable size to the subject; it occurred approximately 12 months prior to the assessment date. Both parties included it as a comparable sale. Plaintiffs *Page 13 
appraiser adjusted the sale price because "[t]he broker waived his normal commissions of approximately $130,000 and is part of the purchasing ownership." (Ptf s Ex 1 at 50.) The adjusted price per square foot was approximately $20.
Plaintiffs appraiser concluded that the subject property had "slightly inferior access and exposure relative to the comparables." resulting in "a unit value of $21/SF" for the subject property. (Ptf s Ex 1 at 53.) Plaintiffs appraiser offered no evidence to support his conclusion that the subject property is "slightly inferior."
Defendant's appraiser concluded that the appropriate price per square foot was $30 even though only three of the ten sales sold for more than $30 per square foot and for each of those sales the parcel size was substantially less than one acre. (Def s Ex A at 18.) The court finds that Defendant's appraiser's price per square foot is supported by land parcels substantially smaller than the subject property and sales occurring far from the assessment date.
None of the land sales selected by the appraisers noted river access or abutment. It is reasonable to assume river access or abutment adds value as well as additional costs and responsibilities. There is no evidence before the court to support an adjustment to the price per square foot for river access or abutment.
After careful review of the evidence, the court concludes that the appropriate price per square foot for the subject property's land under the cost approach is $23, resulting in a total land real market value of $5,250,000 (rounded).
Plaintiffs reported structure costs were $11,940,637. (Ptf s Ex 1 at 85.) In determining the structure costs, both appraisers relied on Marshall Swift or Marshall Valuation Services. (Ptf s Ex 1 at 54 — 56; Def s Ex A at 19 — 20.) Plaintiffs appraiser determined a depreciated replacement cost of $10,666,021. (Ptf s Ex 1 at 58.) Defendant's appraiser determined a total *Page 14 
cost of $9,919,900 (rounded). (Def s Ex A at 20.) Their total cost difference is approximately $14 per square foot or less than one percent of the total price per square foot. Given the immateriality of the price per square foot difference, the court concludes that the structure cost is $10,000,000 (rounded).
The total value indicated by the cost approach is $15,250,000.
D. Income approach
The first step in the income approach is to determine the gross rent. After reviewing five comparable properties, Plaintiffs appraiser concluded that the Salem Convention Center has "[v]ery similar physical characteristics, but a slightly superior market for a conference center" because it is closer to Portland and located in the state capital. (Ptf s Ex 1 at 65 — 66.) Plaintiffs appraiser stated:
 "The Salem Convention Center's historic and budgeted gross income has been close to or slightly above $3 million for the last couple of years. In this analysis, we conclude $3 million for the subject's gross rent."
(Id. at 66.) Defendant's appraiser computed a "gross operating profit" of approximately $3,800,000 (rounded). (Def s Ex A at 23.) Defendant's appraiser's price per square foot was not a blended rate based on the subject property's actual convention center room square footage but her belief that the assemblage value of the convention center and adjacent hotel supported a rate close to the average rent for trade shows. (Id. at 22.) Although Defendant's appraiser admitted in her report that "[t]he entire facility would need to be reviewed in order to provide a complete income approach," Defendant's appraiser did not make that "review." (Id.) Defendant's appraiser's rental rate per square foot is not supported by her testimony.
In the case before the court, there is a lack of gross rent history for comparable properties and only one year of gross rent history for the subject property. Even though it may not be *Page 15 
reasonable to conclude in the short term that the subject property can match or exceed the gross rent history of the Salem Convention Center, no reliable evidence to the contrary was submitted. The court accepts Plaintiffs gross rent estimate of $3 million.
The second step in the income approach is to determine an expense ratio in relation to gross rent. Even though the parties agree that the subject property's limited operational history is not a useful measure of potential gross rent, Plaintiffs appraiser relied on a 2009 expense analysis to determine a total expense ratio, including property taxes and reserves, of 94 percent. (Ptf s Ex 1 at 69.) Plaintiffs appraiser supported his estimate by providing a table from 2008 TRENDS in the Conference Center Industry, showing a total expense rate, including property taxes and other unidentified fixed charges, of 93.5 percent. (Id. at 68.) That same source reported a computed gross rent of approximately $2 million for 12,372 average square feet of meeting space which is substantially less than the subject property's 30,738 square feet of meeting space. (Id.) Plaintiffs appraiser admits that the 5 percent reserve allowance is "higher than for a typical commercial property, but it takes into account the very high level of AV and other technological aspects of the subject." (Ptf s Ex 1 at 69.) Defendant's appraiser concluded that expenses "were estimated at 70% based on the 2008 Smith Travel Host Study for Full Service Hotels." (Def s Ex A-22.) Defendant offered no evidence to show the expense ratio comparability between full service hotels and convention centers. Plaintiffs appraiser, in discussing capitalization rate, stated:
 "Although not directly comparable to conference centers, hotels have similar risk characteristics and are believed to be affected by changes in the economy in a similar manner to how conference centers are affected."
(Ptf s Ex 1 at 70.) That statement addresses "risk characteristics," but does not discuss income and expense ratios. *Page 16 
For the subject property, the court concludes that a reasonable expense ratio, excluding property taxes and allowing a more typical reserve or replacement allowance for a new structure, is 84 percent.
The difference between gross rent and operating expenses is net operating income. Net operating income is divided by a capitalization rate to determine total real market value. The parties suggest similar capitalization rates with one important difference. Plaintiffs appraiser's capitalization rate, 10 percent, does not include an "effective" property tax rate and Defendant's appraiser's capitalization rate, 9.69 percent, does include an "effective" property tax rate. (Ptf s Ex 1 at 70; Def s Ex A at 22.) Plaintiffs appraiser gave the most weight to a capitalization rate at the high end of "sales comparable for hotels." (Ptf s Ex 1 at 70.) Plaintiffs appraiser concluded that the capitalization rate of the comparable properties averages 9.7 percent. (Id.) Defendant's appraiser "derived" her capitalization "from the PKF Consulting 2008 Hospitality Investment Survey of Full Service Hotels." (Def s Ex A at 22.) The court agrees with Defendant's appraiser that the capitalization rate should include a property tax rate. The court concludes that the capitalization rate is 9.7 percent.
Using the estimated gross rent, operating expenses, and capitalization rate, the subject property's real market value is $5 million (rounded). This amount must be reduced for the personal property value, $1,462,000, reported by Defendant's appraiser. (Def s Ex A at 23.) The total indicated land and improvement real market value is $3,538,000.
Plaintiffs appraiser concluded that "the lack of available market data" makes it "very difficult to estimate how the subject will ramp up to full occupancy." (Ptf s Ex 1 at 73.) Plaintiffs appraiser concluded that the "as-is market value," should be determined by deducting the NOI shortfall from the subject's concluded stabilized value, the difference between "the *Page 17 
subject's stabilized NOI to the estimated NOI that the subject is actually able to achieve." (Id.) Plaintiff s appraiser presented little information about that proposed adjustment. Given the lack of information related to the proposed absorption adjustment, the court finds such an adjustment to determine value is unsubstantiated and too speculative or possibly misplaced in the analysis.
E. Reconciliation
The income and cost approaches result in a range of value from $3,538,000 to $15,250,000. Even though the parties determined the subject property's real market value using both the cost and income approaches, Plaintiffs appraiser relied on the income approach. Plaintiffs appraiser concluded that the cost approach "is not a reliable indicator of market value." (Ptf s Ex 1 at 58.) In contrast, Defendant's appraiser determined that the subject property's real market value was within the range of indicated values determined by the cost and income approaches. (Def s Ex A at 25.)
"The final value opinion does not simply represent the average of the different value indications derived. No mechanical formula is used to select one indication over the other. Final reconciliation relies on the proper application of appraisal techniques and the appraiser's judgment." Appraisal Institute, The Appraisal of RealEstate 560 (13th ed 2008).
In reconciling the wide range of indicated value, Defendant questioned how the subject property could have a total real market value less than the land real market value determined using the cost approach. An answer is found in the development restriction imposed by the City of Bend. The highest and best use of the subject property vacant is not the same as the highest and best use of the subject property as developed. Plaintiff, as part of its negotiated development plan with the City of Bend, agreed to build and operate a convention center of a size that is often owned and operated by a city or county. In granting approval for a development plan that *Page 18 
included a convention center in addition to housing units, the City of Bend required the property owners to build the convention center before any other approved development. The wide range of indicated value between the income approach and cost approach support the conclusion that the highest and best use of the subject property's land, if vacant, is not a convention center. Given the development restriction imposed by the City of Bend, there is only one legally permissible developed use — a convention center. The subject property was developed in compliance with the one legally permissible use. The result of the subject property's development is a real market value less than if the subject property was vacant and could be developed without the negotiated city restrictions.
The income approach results in a real market value as of the date of assessment that accounts for the City of Bend development restrictions. Because the subject property is an income property and was developed in compliance with the development restrictions, the income approach is the best indicator of the subject property's real market value.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that the subject property's real market value for the tax year 2008-09 was $3,538,000. Now, therefore, *Page 19 
IT IS THE DECISION OF THIS COURT that the real market value of the land and improvements of the subject property identified as Account 101068 for tax year 2008-09 is $3,538,000.
Dated this ___ day of August 2010.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailingto: 1163 State Street, Salem, OR 97301-2563; or byhand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60days after the date of the Decision or this Decision becomesfinal and cannot be changed.
 This Decision was signed by Presiding Magistrate Tanneron August 5, 2010. The court filed and entered this Decisionon August 5, 2010.
[1] Tisiot concluded that "[d]ue to the lack of market sales of residential and non-residential convention centers this approach does not apply." (Def's Ex A at 21.)
[2] Liebow stated that "[t]he Cost Approach is useful in determining the feasibility of this type of property; however, it is not a reliable indicator of market value." (Ptf's Ex 1at 58.)
[3] Tisiot stated that the parcel was 6.45 acres. (Def s Ex A at 18.)
[4] Annual effective gross rent:
16,000 X .87 per square foot = $13,920
14,000 X .09 per square foot = $ 1,260
 Total $15,180 X 40 percent occupancy rate = $6,072 X 365 days =$2,216,280

[5] Tisiot testified Liebow's reference to the "high level of AV and other technological aspects" supports her conclusion that the condition and quality of the subject property is excellent, not "good or average" as suggested by Plaintiff.
[6] Parties' Position Statements, filed November 18, 2009.
[7] References to the Oregon Revised Statutes (ORS) are to 2007.