Jim GANGLE,
Lane County Assessor

*v.*

DEPARTMENT OF REVENUE

*and*

EVERGREEN UNION
RETIREMENT ASSOCIATION, INC.,
*Intervenor*

(TC 3384)

Mr. David B. Williams, Assistant County Counsel, Lane County, represented plaintiff.

Defendant waived appearance.

Mr. Larry J. Anderson, Anderson & Clayton, Eugene, represented intervenor.

Decision rendered for intervenor dated August 9, 1995.

## CARL N. BYERS, Judge.

This appeal concerns the 1991-92 assessed value of an 18-story retirement complex in Eugene. Evergreen Union Retirement Association, Inc., (Evergreen) a nonprofit corporation, owns and operates the property as housing for the elderly. On January 21, 1994, this court found the real market value of the property was $3,770,000 as of July 1, 1991. On appeal, the Oregon Supreme Court concluded that this court erred in construing ORS 308.490 and remanded the matter for further proceedings. To assist the court in resolving the issues on remand, the parties submitted additional written memorandum in support of their positions.

### CONSTRUING THE STATUTE

ORS 308.490(2) provides:

"(2) In determining the real market value of the property of a nonprofit home for elderly persons, operated by a corporation described in ORS 307.375, the county assessor shall not take into account considerations of replacement cost, but shall consider:

"(a) The amount of money or money's worth for which the property may be exchanged within a reasonable period of time under conditions in which both parties to the exchange are able, willing and reasonably well informed.

"(b) The gross income that reasonably could be expected from the property if leased or rented to the public generally, less annual operating expenses, reserves for replacements and insurance, depreciation and taxes.

"(c) The relative supply and demand for similar properties.

"(d) The relative value of the location of the property."

In applying the statute, this court stated that subsection (b) does not require a specific deduction of depreciation. The Supreme Court reversed, concluding that the deduction for depreciation is mandatory. The opinion of the Supreme Court and the arguments of the parties require this court to reconsider the legislature's intent in ORS 308.490.

On the surface, the legislature appears to have intended that nonprofit homes be valued for ad valorem taxation at something less than real market value. The legislature found that "ordinary methods of determining the real market value of real property * * * are not appropriate * * *." ORS 308.490(1). Also, "the benefits inherent in operation of these homes * * * justifies the use of criteria set out in subsection (2) * * *." *Id.* These statements imply that the statute is intended to provide some kind of tax benefit for this type of housing. However, the only value mentioned is "real market value." The term real market value is defined by ORS 308.205 as:

"[T]he minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion from an informed buyer acting without compulsion, in an arm's-length transaction during the fiscal year." ORS 308.205(1).

Real market value is the standard used throughout the ad valorem statutes (except for special assessments).

Although the legislature used real market value, it may have expected that by limiting the appraisal methods, the resulting value would be lower than if determined by other methods. As indicated by ORS 308.205, real market value is determined by particular methods and procedures. Typically, there are three approaches to value: (1) cost approach, (2) income approach and (3) market comparison approach. ORS 308.490(2) specifies that the assessor "shall not take into account considerations of replacement cost." What the legislature intended to accomplish by this is not clear.[1]

---

[1] One could speculate that advocates for nonprofit homes complained to their legislative representatives that the traditional cost approach used by assessors for nonprofit properties was resulting in values in excess of real market value. If so, the legislative intent in ORS 308.490 would be to direct assessors to use methods which accurately reflected real market value. *See* minutes of House Committee on Taxation, May 14, 1969, SB 508.

In the cost approach, replacement cost is a separate and different concept from reproduction cost. A strict construction of the statute would prohibit the assessor from considering replacement cost, but not from considering reproduction cost. However, because the statute appears intended to grant some kind of relief, it is appropriate to construe it broadly and exclude consideration of any cost approach. *Puget Sound B. & D. Co. v. S.U.C.C.*, 168 Or 614, 126 P2d 37 (1942).

The legislature may have assumed that excluding replacement cost would result in a lower value. That is not necessarily the case. In the cost approach, an appraiser deducts depreciation or loss in value from all causes, including physical deterioration, functional obsolescence and external or economic obsolescence. Even if a nonprofit home for the elderly was in good physical condition, there could be significant functional obsolescence, including deficiencies under the Americans With Disabilities Act or other health and safety regulations. Likewise, an older facility could suffer obsolescence due to room arrangement, room size, or other features which are out-of-date and have little market appeal. An estimate of depreciated replacement cost could indicate a value less than that indicated by either the income approach or the market comparison approach. Thus, excluding consideration of replacement cost has the potential of resulting in a higher assessed value as well as a lower value.

The statute requires the assessor to consider four factors concerning the subject property. Two of the factors are methods or approaches to valuing property: the market comparison approach and the income approach. The other two factors are general considerations, (1) supply and demand, and (2) location. The legislature's specific direction to consider these latter two factors is somewhat puzzling because they are inherently considered in application of the two approaches. The market comparison approach necessarily considers property location and the effects of supply and demand. Similarly, the income approach must consider how location and supply and demand affect rents, vacancy, and other factors.

Giving consideration to the market comparison approach, location, and supply and demand, presents no

problem for the assessor. The problem lies in the income approach. ORS 308.490(2)(b) directs the assessor to consider:

"(b) The *gross income* that reasonably could be expected from the property *if leased or rented to the public generally, less* annual operating expenses, reserves for replacements and insurance, *depreciation* and taxes." (Emphasis added.)

The statute does not specify what it means by depreciation. Reason indicates that the legislature must have meant accounting or book depreciation. It could not have intended depreciation in the appraisal sense because the loss in value due to physical condition, functional obsolescence and external obsolescence could exceed a property's total annual income. In that case, the approach would indicate a zero or negative value, an absurd result not intended by the legislature.

■    Book depreciation is an accounting concept usually having significance in connection with recovery of capital for income tax purposes. It is typically based upon an accounting method not related to market value. In this instance, Evergreen's appraiser used straight-line depreciation based upon a useful life of 45 years. The assessor argues that this is arbitrary, particularly in light of the fact that Evergreen is a nonprofit organization and does not pay income taxes.

■    Unless an estimate of depreciation is market derived, its introduction into any valuation approach lessens the reliability of the approach. By specifying that book depreciation is to be subtracted from gross income, the legislature made the income approach a less reliable indicator real market value.

The direct capitalization version of the income approach divides net operating income (NOI) by a capitalization rate to find the value. The direct capitalization rate reflects the relationship between sales prices and NOI as derived from market data. As such, it inherently reflects all forms of actual depreciation. It is theoretically inconsistent to derive a capitalization rate using market NOIs, which are not adjusted for book depreciation, and apply that rate to an NOI reduced by book depreciation. Although the method

results in less than real market value, that is what the statute seems to require.

The assessor's dilemma is compounded by the instructions of the legislature to "consider" both the market and the income approaches. The statute also directs the assessor to "consider" location and supply and demand. "Consider" is a weak word and does little to aid the assessor in determining value. Did the legislature intend the two approaches to be weighted equally? Are all four factors to be given equal weight?

An appraiser estimates the value of property based on a systematic analysis of market data. If an appraiser uses all three approaches to value, the appraiser will obtain several indications of value. In such case, the appraiser must resolve the differences and, at least for property tax purposes, arrive at a specific estimate of value.

> "Reconciliation requires appraisal judgment based on a careful, logical analysis of the procedures that lead to each value indication. Appropriateness, accuracy, and quantity of evidence are the criteria with which an appraiser forms a meaningful, defensible final value estimate." Appraisal Institute, *The Appraisal of Real Estate* 555 (10th ed 1992).

It is essential to recognize that the process of reconciliation is not just an averaging process or a mechanical application of a formula. Use of the word "consider" in ORS 308.490 may suggest that the legislature recognized this critical point. Reconciliation is a matter of judgment based upon analysis of the specific evidence. Hence the problem: If the income approach is by legislative direction expressly made less reliable, should the thoughtful assessor give it less weight?

With these questions and considerations in mind, this court is required to reevaluate the evidence to determine the real market value of Evergreen's property.

■        After reviewing the text and context of the statute, the Supreme Court determined that the:

> "[D]eduction for depreciation * * * is mandated as a part of the definition and determination of net annual income.
>
> "* * * * *

"All other things remaining the same, taxpayer's real market value, as described in the special statute, will be proportionately less after the statute is followed * * *." 320 Or at 499.

Based on this interpretation, the legislature must have intended that a market-derived capitalization rate be applied to an artificially low NOI. This will result in some tax relief, which the Supreme Court found the legislature intended.

■ The only evidence of a market comparison approach was a linear regression analysis prepared by the assessor's appraiser. The appraiser did not adjust his market data for such factors as room size and services provided. Consequently, the reliability of the indication of value is questionable. The appraiser did not rely on the approach as a separate value indicator but only as a check on the income approach.

The determination of value by the income approach need be adjusted only for book depreciation. As suggested by the assessor, a shortcut method to do this is simply to apply a capitalization rate to the $66,000 of book depreciation. Using the court's determined rate of 13.822 percent, that amount is $477,500 (rounded). Deducting that amount from $3,770,000 leaves an indicated market value of $3,292,500.

## HUD ADJUSTMENT

Intervenor contends that the restrictions and burdens placed on the property under its agreements with the Department of Housing and Urban Development (HUD) constitute governmental restrictions which reduce its real market value. *Bayridge Limited Partnership v. Dept. of Rev.*, 321 Or 21, 892 P2d 1002 (1995). The court finds that the law and facts do not support intervenor's contention.

In defining real market value, ORS 308.205(d) provides:

"If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, real market value shall not be based on sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

Intervenor claims that the HUD restrictions on use of the subject property reduce the taxable value of intervenor's interest. The only value evidence relied upon by intervenor was the actual income from the property and the capitalization rate from a property which receives 60 percent of its income from Medicaid. Intervenor's appraiser speculated that increased regulation and loss of control would justify a higher capitalization rate. The court is not persuaded that the appraiser gave adequate weight to the benefits of participating in the HUD program. It may be just as likely that the increased security and lower risk of credit loss would offset the loss of control.

■ Intervenor's HUD adjusted income approach raises a legal question. Is ORS 308.490(2)(b) inconsistent with ORS 308.205(d)? ORS 308.490(2)(b) provides that in using the income approach, the assessor is to use the gross income that could reasonably be expected from the property if leased or rented to the public generally. This language reflects a legislative intent that the assessor ignore governmental benefits and restrictions associated with nonprofit housing for elderly persons. This specific provision appears inconsistent with ORS 308.205(d). If the income to be used is that which could be received from the public generally, it follows that governmental programs such as low income housing or HUD programs which limit the income must be ignored. In addition, ORS 308.205(d) pertains to the use of sales in the market comparison approach, not the income approach.

In summary, ORS 308.490 uses a market test for everything except the income approach. Although the income approach uses a market test for purposes of determining gross income, it mandates a deduction for book depreciation, which may result in an artificially low NOI. Consequently, the income approach under ORS 308.490(2)(b) may not indicate market value. The statute's specific directions for use of the income approach are inconsistent with acknowledging government restrictions which restrict the income of the property. In this case, where the value is determined by the income approach, no adjustment should be made for any HUD restrictions on the property. Moreover, the evidence failed to establish any different value by virtue of the HUD restrictions.

The court finds that the real market value of the subject property as of July 1, 1991, is $3,292,500. Costs to neither party.