DECISION
Plaintiff appeals the Lane County Board of Property Tax Appeals Real Property Order, dated February 9, 2010, concluding that the 2009-10 real market value of property identified as Account 1263985 (subject property) is $1,034,373. A telephone trial was held on November 16, 2010. David W. Sohm (Sohm), Registered Appraiser 3, appeared and testified on behalf of Plaintiff. David E. Carmichael, Attorney at Law, appeared on behalf of Defendant. Robert D. Bennett (Bennett), subject property's manager and owner of Bennett Management Company, LLC, testified on behalf of Defendant.
Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection.
 I. STATEMENT OF FACTS
The subject property, known as Commerce Square, is a two-story, mixed-use (retail and office) building originally constructed in 1979. (Ptf's Ex 1 at 4; 8.) The "building was gutted in 2005 and renovated for retail and office use in 2006." (Id. at 8.) There are 4 retail tenant spaces of varying size on the first floor and 11 small offices on the second floor. (Id.) Access to the second floor is provided by stairs at "both ends of the central hallway, but there is no elevator." (Id.) The building is located on a corner with "[a]ccess to area freeways at Randy Pape' Beltline." (Id. at 7.) There is no dispute that there is adequate paved parking behind the *Page 2 
building. Bennett testified that he "can't find a strong retail tenant" because there is no parking in front. He testified that many of his tenants have no "staying power" during an economic downturn and many of the subject property's tenants are "month to month" rather than "long term leases."
Sohm, who stated that he has over 30 years of appraisal experience, concluded that "[t]he existing retail and office use of the building represents a physically possible, legally permitted, and financially feasible use of the property and is concluded to be representative of the highest and best use of the property as improved." (Id. at 11.) Bennett reminded the court that the subject property is a "conversion." Bennett characterized the subject property as a "mixed use rehab" site that would "not stand up if built as a true retail project."
Sohm concluded that all "three approaches to value [cost, sales comparison, and income] can be reliably applied to the subject property." (Id. at 12.) Looking first to the cost approach, Sohm stated that "the value of a property is derive[d] by adding the estimated value of the site to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." (Id. at 13.) In his appraisal report, Sohm detailed the land sales used to determine an indicated land value of $494,000. (Id. at 14.) He stated that "the building and site improvement costs were developed using the Marshall Valuation Service." (Id. at 14.) Sohm testified that he concluded that physical depreciation, "loss in value due to age," at a rate of 11 percent was appropriate for the subject property. (Id. at 15.) Sohm concluded:
 "The depreciated cost of the improvements is estimated to be $895,350. Adding the previously estimated site value of $494,000 brings the total indicated value by the cost approach to $1,389,350, which is rounded to $1,389,000 * * *."
 (Id. at 16.) *Page 3 
Defendant's representative challenged the applicability of the cost approach given the subject property's actual age and rehabilitation and read from the 12th edition ofThe Appraisal of Real Estate, page 354.
Second, Sohm reviewed his sales comparison approach. (Id. at 17 through 20.) He testified that he reviewed over 148 sales for 2007, 2008, and 2009 before he selected and inspected four "multi-tenant [properties as] competitive with the subject property." Sohm briefly reviewed each sale he identified, concluding that "Sale 1 is the most comparable property in terms of use and location, but none of the sales are ideal due to the mixed use nature of the subject property." (Id. at 20.) He "selected" a "price per square foot of $169 * * * [and applied] this unit value to the 8,168 square feet of the subject building" to determine an indicated "value of $1,380,392, which is rounded to $1,380,000." (Id.) Defendant's representative challenged the applicability of the sales comparison approach, stating that the subject property is not "owner occupied" and it was "purchased for income." He read from the 12th edition of The Appraisal of RealEstate, page 419. Each of the four properties selected by Sohm as comparable was reviewed and differences noted.
Third, Sohm testified that for the income approach the subject property has an operating history in its "present configuration." (Id. at 21.) He determined potential gross income of $144,984 per year, including common area charges and $3,000 per year of additional income from a "double sided sign." Bennett proposed an "effective gross income" less than the actual effective gross income for 2008 but more than the actual effective gross income for 2009. (Def's Ex A at 1.) Bennett testified that Sohm's "effective gross income" is "not reasonable as of January 1, 2009, because it is a "challenge to operate in this environment." Sohm testified that there is a "double faced billboard" located on a corner of the subject property which is owned by *Page 4 
Meadow Advertising. He concluded that "a land lease provide[s] income to the property owner with no expenses associated with the billboard." (Ptf's Ex 1 at 9.) Bennett testified that "there is no income from a billboard."
Sohm testified at as of January 1, 2009, "vacancy was an issue" that was subsequently cured. He concluded that "[a] factor of 7% of gross income is projected as a stabilized vacancy for the subject property in recognition of the extended vacancy of Suite A and the expected turnover of the small office spaces." (Id. at 22.) Bennett testified that the vacancy rate should be 12 percent. He conceded that "many of the small offices were vacant as of January 1, 2009, but now many have filled up." Sohm testified that "even though worsening recession," the subject property "has stabilized occupancy."
Sohm determined an "adjusted expense ratio" of 21 percent of reported income and 19.6 percent of projected effective gross income" excluding property taxes. (Id. at 23.) To a net operating income of $108,363, Sohm applied an "overall capitalization rate of []7.94 %,"[1] resulting in an "indicated market value" of $1,365,000 (rounded.) (Id. at 24.). Bennett testified that, given the age, lack of elevator, and configuration of the subject property, an investor would "ask for a higher return than 7 percent." He suggested that the capitalization rate should be 8 percent and that the property taxes should be a part of the expense ratio, resulting in a 35 percent expense ratio. (Def's Ex A at 1.)
Sohm concluded that "the income approach has the most reliable information and yields the most credible result." (Id. at 26.) He testified that the market value of the subject property at January 1, 2009, is "well-supported" and "concluded to be $1,365,000." (Id.) Defendant agreed *Page 5 
that the income approach is the most reliable indicator of real market value, concluding that the real market value, $1,034,373, set by the Board of Property Tax Appeals should be the indicated value as of January 1, 2009.
 II. ANALYSIS
The issue before the court is the real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v.Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
A. Highest and Best Use
Prior to reviewing the parties' approaches to valuation, the highest and best use of the subject property must be considered. Even though Defendant believes that, if the subject property were built today, it would be configured differently, both parties agree that the current use of the subject property as mixed use retail and office building is legally permissible.
B. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2); OAR150-308.205-(A)(2). Plaintiff presented all three approaches of valuation, putting the greatest weight on the income approach. Defendant determined the subject property's real market value using the income approach. *Page 6 
C. Income approach
The court agrees with the parties that, because the subject property is an income producing property, the best approach to value the subject property is the income approach. The first step in the income approach is to determine the gross rent and effective gross rent after vacancy. Sohm concluded that the billboardshould generate land rent for Plaintiff and Bennett testified that the subject property does not collect any income from the billboard's owner. The court relies on Bennett who has managed the property for many years. Sohm calculated a stabilized rent income in excess of income previously reported for calendar year 2008 and 2009. There was no evidence that calendar year 2008 was not a typical year; whereas, it is evident that the large number of vacancies during the year 2009 makes 2009 an atypical year, especially now that the subject property is almost fully occupied. For this analysis, the subject property's effective gross income should be close to the reported 2008 effective gross income.
The second step is to determine an expense ratio in relation to gross rent. Sohm's expense ratio is slightly less than the subject property's actual operating expense ratio for 2008. Defendant includes property taxes in its estimated operating expense ratio. The court agrees with Plaintiff that property taxes should be removed from operating expenses when calculating the operating expense ratio and the operating expense ratio should be slightly more than Sohm's operating ratio.
The difference between gross rent and operating expenses is net operating income. Net operating income is divided by a capitalization rate to determine total real market value. Sohm selected a seven percent capitalization rate from among a range of rates (6.49 percent, 6.5 percent, 6.72 percent, and 9.29 percent) for four property sales he identified as comparable to the subject property. Defendant picked a capitalization rate of eight percent based on "selected *Page 7 
Assessor Commercial Benchmark retail, office sales." (Def's Ex A at 1.) Bennett testified that he did not know anything about the sales that were selected by Plaintiff's representative. The court accepts Sohm's seven percent rate with the addition of property taxes and rounds Sohm's capitalization rate to eight percent.
Using adjusted estimated effective gross rent, operating expenses, and capitalization rate, the court concludes that, as of the assessment date, the subject property's real market value is $1,235,000 (rounded).
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff's appraisal report and determination of the subject property's real market value is accepted with few adjustments as described above. Now, therefore,
IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of the subject property identified as Account 1263985 is $1,235,000.
Dated this ____ day of February 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on February 22, 2011. The Court filed and entered thisdocument on February 22, 2011.
[1] Sohm testified that the 7 percent capitalization rate was based on the four comparable sales with "overall capitalization rates ranging from 6.49% to 9.29%." (Id. at 24.) To the 7 percent capitalization rate, 0.94 percent was added for property taxes. (Id.)
[2] References to the Oregon Revised Statutes (ORS) are to year 2007. *Page 1