DECISION
Plaintiffs appeal the 2009-10 real market value of property identified as Account 10203996, Lot 103 (subject property). A trial was held in the Oregon Tax Courtroom on March 7, 2011. Stuart Foster, Attorney at Law, appeared on behalf of Plaintiffs. Curtis Burrill (Burrill) and Robert Greene (Greene), SRA, MAI, testified on behalf of Plaintiffs. David B. Arrasmith (Arrasmith) appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 5 and Defendant's Exhibits A and B were received without objection. The record closed on March 23, 2011.
Plaintiffs appealed the Jackson County Board of Property Tax Appeals Orders, dated March 3, 2010, for 13 tax lots[1] located in the same industrial subdivision and owned by Plaintiffs. Those appeals are TC-MD 100324D and TC-MD 100326D through TC-MD 100338D and were heard all heard at the March 7, 2011, trial. The court's Decisions for the other 13 appeals are identical to this Decision except for the account and tax lot number. *Page 2 
 I. STATEMENT OF FACTS
The subject property, located in White City, Oregon, is an industrial subdivision platted into 13 lots as of December 23, 2008. (Ptfs' Ex 2-4; Def's Ex A-4.) The 13 lots range in size from 2.10 acres to 11.29 acres. (Ptfs' Ex 2-3.) At trial, Burrill described the subject property as "shovel ready." Arrasmith testified that "[i]n 2004 the entire 80 plus acre site received State of Oregon Industrial Site Certification by the Oregon Economic and Community Development Department." (Def's Ex A-11.) He stated that "[c]ertifying industrial lands as `project ready' provides assurance that a site can be developed within 180 days or less which can save prospective companies significant cost, time, and risk." (Id.) Burrill testified that, as of January 1, 2009, "the certification was not active" and he has had "no inquiries because of the certification."
The subject property "is zoned GI, General Industrial" with "necessary utilities [] in place along Avenue G to the south, * * * [but] no work has been done toward completion of any infrastructure serving the individual lots." (Ptfs' Ex 2-3.) The witnesses, Burrill and Arrasmith, discussed the "jurisdictional transfer" of Avenue G, a two lane road, from Jackson County to the Oregon Department of Transportation and the impact of designating Avenue G "as a Route 140" truck route "bypass." (Ptfs' Ex 2-32.) Burrill testified that, as of the date the subdivision was platted, the jurisdictional transfer had not occurred; Arrasmith testified that he was told "October 31, 2007" was the "effective date of transfer." (Def's Ex A-10.) Arrasmith concluded that "[i]n respect to traffic count, the subject is superior to all the comparables." (Id. at 11.) Burrill testified that he has seen "no increase in traffic along Avenue G" even though access to the platted lots must be "shared." *Page 3 
Burrill testified that, even before the subdivision completed the platting approval process, the lots were listed for sale through his brokerage firm on a multiple listing service and "Loopnet." He testified that the listing prices ranged from $3.00 to $3.25 per square foot. Arrasmith testified that, as of the assessment date of January 1, 2009, the county set the real market value "at eight percent less," or $3.00 per square foot, than the listing price of $3.25 per square foot. Burrill testified that, as of January 1, 2010, the listing prices were reduced to $1.50 per square foot with the exception of Lots 114 and 115, "two acre parcels," that were listed for $3.00 per square foot. He testified that he has not sold any lots since "2005 and 2006." Burrill testified that, as of January, 2009, there was over "250 acres of unimproved general industrial land available for sale" at a time when "Jackson County's unemployment rate was 12.8 percent."
Greene testified that he appraised the subject property. Greene testified his "opinion of value" was based on the lots being "unencumbered." (Ptfs' Ex 2-4.) He testified that, before he had heard the testimony of Burrill, he was unaware that "tax lots 103 and 105 are subject to a 60 foot wide access easement" related to the neighboring wildlife area. Greene testified that those "easements should be excluded" from the square footage. Greene and Arrasmith agree that the subject property's highest and best use as vacant is general industrial. (Ptfs' Ex 2-34; Def's Ex A-16.) Greene testified that even though "the highest and best use of the property is for industrial development, it will not be optimally marketable until there is improvement enough in the economy to generate additional demand for manufacturing facilities in the area." (Ptfs' Ex 2-34.) He testified that currently there is "high supply and low demand" with "no available financing" and a "limited number of users because of the subject property's size and location." Burrill testified that the "market bottomed" in "February/March 2009," and that, in his opinion, *Page 4 
there has been "no change in the market between January 2009 and January 2010, when the listing prices for the subject property were reduced."
Like Arrasmith, Greene testified that he concluded that the only approach "applicable" for the subject property is the "sales comparison approach." (Id. at 35; Def's Ex A-17.) He testified that, even though he expanded his search for comparable sales to "throughout Jackson County and into Josephine, Douglas, and Klamath Counties," he only found four "relevant sales," two properties located in Medford and two properties located in White City and two listings. (Ptfs' Ex 1-37, 1-38.) In response to questions, Greene testified that he confirmed the sales using "public documents, secondary verification, and conversations with knowledgeable parties" and he did not inspect comparable sales 1 and 2. Arrasmith testified that his "first level of review disclosed 13 sales of land in the general area of Medford, Central Point, and White City." (Def's Ex A-17.) He concluded that
 "[s]ales prices on a per square foot basis in Medford and Central Point were noticeably higher than the White City sales and were eliminated because of the large location adjustments that would be required. The discovery of the required high location adjustment highlights the importance that location plays in increasing or reducing a property's real market value. Removing the Medford and Central Point sales left five sales for further review."
(Id. at 18 (emphasis omitted).)
Greene concluded that two properties located in Medford, comparable sale 1, Bullock Road, set the "upper limit of value" at $3.50 per square foot and comparable 2, Helicopter Way, set the "lower limit of value" at $1.28 per square foot. (Id. at 38.) Arrasmith testified that because of the "steep slope" it would "take a lot of work to level" the Bullock Road property and "retaining walls" would be required. He testified that the Bullock Road property is not "topographically" the similar to the subject property. (Def's Ex A-55.) Arrasmith contrasted the Bullock Road property with another property on the same street that sold the same day for $8.24 *Page 5 
a square foot; he described that property as "level, shovel ready." (Id. at 58.) Arrasmith testified that, in the Helicopter Way sale transaction, the parties negotiated an additional cost transfer of $30,000 to "pave and do all the curbs and gutters." Greene testified he had no knowledge of whether or not that had been done.
Greene testified that comparable sale 3, Pape Properties, located on G Avenue, sold on November 8, 2008, for $3.31 per square foot and was not representative of the market because the buyers "intended to improve the site with a Kenworth Truck dealership and service facility." (Ptfs' Ex 2-38.) The site is visible from Interstate 5 and the sale was "negotiated late spring/ early summer 2008." (Id.) Burrill testified that the sale price reached between the party who negotiated the purchase and the purchaser was influenced by their professional association. Pape Brothers sells and leases heavy equipment and the individual who negotiated the purchase was employed by Knife River, the largest "site work company in southwest Oregon." Arrasmith testified that the Pape Properties sale is his "best comparable or ideal comparable" because "the property was level" and located close to the subject property. He testified that he spoke with the "principals" and "all agreed that the purchase price of this tax lot represented fair market at the time." (Def's Ex A-39.)
Greene testified that comparable sale 4, Avenue B, selling for $1.37 per square foot in March 2009, was a "good sale" and the "best sale." (Ptfs' Ex 2-38.) He testified that comparable 4 was located "close to the subject property," was "almost 6 acres" in size, and the transaction was between a "knowledgeable buyer and seller." Arrasmith testified that he "rejected" this sale because "(1) it was an atypical sale of a lender [who owned a] foreclosed property, and (2) it was recorded after the January 1, 2009 appraisal date." (Def's Ex A-18.) He testified that, during a "sale verification" conversation, he was told that the property owner, the *Page 6 
bank, instructed the listing agent "to sell quickly." Burrill testified that this sale had a "similar sale date to the subject property's valuation date" because it normally "takes 30 days or more like 60 to 90 days to close a transaction." Greene testified that this property was "lender owned" for over 18 months and was "not a liquidation sale." Arrasmith questioned Greene about the location of the property on a "cul-de-sac" with "an uncontrolled railroad crossing" and the limited "access/exposure" compared to the subject property. Burrill testified that the subject property is located near "an uncontrolled railroad crossing" that is "200 feet into lot 115."
Greene testified that he included two listings for industrial property located in Medford and White City to set the "ceiling" and he stated that the Medford property offered at $4.74 a square foot is "in a superior location" compared to the subject property.
To arrive at a "final adjusted price" for each comparable sale, Greene testified that he made adjustments for location, access/exposure, and size. (Ptfs' Ex 2-42.) He testified that the "percentage adjustments" were "judgment calls." Greene testified that he did not make a "time adjustment," but considered "time" as part of his "final indicated value" reconciliation, giving the most weight to sales "closest in time" to the assessment date. Greene testified that he determined a range of adjusted prices, "$0.96 — $3.31," concluding that the indicated value for a parcel of "six to seven" acres was $1.40 per square foot and a "smaller size parcel like two acres would be $2.00 per square foot." (Id.) Greene set forth his "VALUE CONCLUSIONS BY LOT" on Plaintiffs' Exhibit 2-45, testifying that the subject property was and "is" a "paper subdivision with no utilities, no street lights, nothing done." Arrasmith testified that the subject property was an "old military base" and "a lot of infrastructure for water, sewer and road exists."
Arrasmith testified that, in reaching his conclusion of the subject property's real market value, he considered the difference in size of the each parcel in the subdivision, e.g., two acre, *Page 7 
four acre, 5.8 acre, 6.7 acre and 11.29 acre. (Def's Ex at 20.) He testified that he made the same types of adjustment for time, location, size, and shape for each parcel, except for Lot 115, which is a corner lot that "demands" a higher price per square foot. (Id. at 21.) Arrasmith was asked why he determined the same price per square foot for lots 113, 114, and 115 when tax lot 113 "fronts a side street, has low traffic count and little visibility." He responded that he did not think there was a material difference among the lots. Arrasmith's adjusted price per square foot ranged from $2.75 to $3.25. (Id. at 21 through 25.) His value conclusions were listed in "Summary of Values," stating:
 "This appraisal report has established a range of value for the subject. The tax roll Real Market Value in each case clearly falls within the range established, and the tax roll opinion of value is reaffirmed in this report.
 "Jackson County requests that the court sustain the tax roll values."
(Id. at 26.)
When asked about his time adjustment, Arrasmith testified that to arrive at a January 1, 2008, real market value, considering the comparable sale date, he added "four percent" for the period January 2007 through August 2007, made no adjustment for the period September 2007 through December 2007, and "subtracted 12 percent" or "one percent per month" for the period January 1, 2008 through December 1, 2008. (See id. at 21.)
Arrasmith testified that comparable land sale 1 was sold on December 10, 2008, and consisted of "8 tax lots," "averaging approximately 0.50 acres each." (Id. at 29.) He testified that "[t]he final package price was * * * $5.01 per sqft * * * [for the] newly created subdivision." In response to questions, Arrasmith testified that this property was improved with "some curbs and sidewalks, utilities stubbed in place for every tax lot, but did not go into the tax lot." Arrasmith conceded that "sale 1 set the range" and was not "identical to the subject," but was "similar to Plaintiff's Helicopter comparable sale" with ".54 acre lots, sidewalk and gutter" *Page 8 
absent the $30,000 case adjustment that Plaintiff did not include "for the curbs/sidewalks, street lights, electric transformers and utilities stubbed out to each lot." Burrill testified that Defendant's comparable land sale 1 is "primarily exterior lots with curbs, gutters, electrical service and other infrastructure."
Arrasmith was asked about the subject property's 2010-11 real market value. Arrasmith testified that he reduced the price per square foot for the subject property's "larger parcel" to its listing price of $1.45 per square foot less "five percent" because a "sale price is generally five percent less than a listing price." Arrasmith testified that he did not know how much the "county's sales ratio study" reported for the decline in real market value between January 1, 2008, and January 1, 2009, and he did not rely on that study when he made the 2010-11 real market value reduction for the subject property. Burrill testified that he did not "ask the county to reduce the real market value for tax year 2010-11." He testified that the "reduction has already taken place and is consistent with the reduced listing price."
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of Plaintiffs' property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year." *Page 9 
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2); OAR 150-308.205-(A)(2).
In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." Chambers Management Corpand McKenzie River Motors v. Lane County Assessor, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute,The Appraisal of Real Estate 335 (12th ed 2001).
The parties have concluded that the only applicable method is the comparable sales approach. Relying on four sales, two sales in Medford and two sales in White City, Plaintiffs' appraiser determined a real market value of $1.40 per square foot for all the subject property parcels that ranged in size from more than 4 acres to 11.29 acres. (Ptfs' Ex 2 at 4.) For those same parcels, Defendant's appraiser relied on four sales, all located in White City, in determining the parcels' real market value that ranged from $3.25 to $2.75 per square foot. (Def s Ex A at 26.) Plaintiffs' appraiser concluded a real market value of $2.00 per square foot for two parcels, one 2.10 acres and the other 2.11 acres. (Ptfs' Ex 2 at 4.) For those same parcels, Defendant's appraiser determined a real market value of $3.75 per square foot and $3.50 per square foot, respectively. (Def s Ex A at 26.)
In evaluating the comparability of sales to a subject property, one measure of comparability is the relationship measured as a percentage between the total amount of the adjustments and the sales price. The general rule is that the lower the percentage adjustment, the closer the comparable sale is to the subject property. Plaintiffs' appraiser's net adjustments ranged from 0 percent to 50 percent. (Ptfs' Ex 2 at 42.) The largest net adjustments were for two parcels less than an acre in size and located in Medford. (Id.) In this case, the smallest size *Page 10 
parcel appealed is 2.10 acres and the largest is 11.29 acres. The subject property is located in White City. There is no evidence that Medford and White City are comparable locations or neighborhoods. The court finds that the net adjustments (25 percent and 50 percent) for Plaintiffs' appraiser's two sales located in Medford show the lack of comparability of those parcels to the subject property.
Both appraisers identified a November 2008 sale of a 6.25 acre parcel located on the same street as the subject property as a comparable property. (Ptfs' Ex 2 at 42, Def s Ex A at 22 — 25.) Plaintiffs' appraiser concluded that no adjustments were necessary to make that parcel comparable to the subject property. (Ptfs' Ex 2 at 42.) Plaintiffs' appraiser determined a final adjusted price of $3.31 per square foot. (Id.) Plaintiffs' witness, Burrill, disputed that the sale was arm's length, emphasizing a business relationship between the buyer and seller. Neither the buyer nor seller testified. In its closing argument, Plaintiffs wrote "that the Lallo to Pape' Sale [the November, 2008, sale] should be disregarded because it is not arms length and was negotiated before the market crash of 2008." (Ptfs' Closing Argument at 5.) For this sale, Defendant's appraiser made a time adjustment (1 percent) for the date of sale to the assessment date and for all parcels except the 5.08 acre parcel a size adjustment was made. (Def s Ex A at 22 — 25.) Defendant's appraiser concluded that this sale was "his best sale" and disputed Burrill's characterization that the sale was not arm's length, reciting conversations he had with the buyer and seller. As previously stated, the buyer and seller did not testify. Because the buyer and seller did not testify and Plaintiffs' dispute their appraiser's conclusion as to the comparability of that sale to the subject property, the court concludes that the November, 2008, sale is not a valid comparable property. *Page 11 
Plaintiffs are left with one comparable sale for the court to consider. Plaintiffs' appraiser's last comparable sale was a 5.87 acre parcel located in White City that sold in March 2009. (Ptfs' Ex 2 at 42.) Plaintiffs' appraiser concluded that no adjustments were necessary to make that parcel comparable to the subject property. (Id.) Plaintiffs' appraiser determined a final adjusted price of $1.37 per square foot. (Id.) Defendant's appraiser's testified that he did not include this sale as one of his comparables because the parcel was listed for $525,000 and sold for $350,000. (Def s Ex A at 45.) He submitted a copy of a Bargain and Sale Deed, dated August 31, 2007, stating that the property was transferred to the mortgage holder for "true consideration * * * stated in terms of dollars is -0-, but consists of other value or property which is the whole consideration for this conveyance." (Id. at 48.) Defendant's appraiser's appraisal report included his recitation of a conversation with the buyer, who told him that "he was approached by the realtor, and invited to make an offer" which he did, stating that his offer "was based on available cash in his budget" and not "on an appraisal." (Id. at 45.) Given that the purchase price in relation to the listing price (a 33 1/3 percent reduction from the listing price) and that the seller was the mortgage holder who held the property for more than 18 months, the court finds that Defendant raised substantial concerns about whether the transaction was arm's length. Those concerns were not answered by Plaintiffs. The comparability of this property to the subject property is severely compromised.
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) *Page 12 
(citing Feves v. Dept. of Rev, 4 OTR 302 (1971)). Plaintiffs have failed to carry their burden of proof. Plaintiffs relied on the comparable sale approach. Two of the four sales were not comparable to the subject property, a third sale was discredited by Plaintiffs' own witness as being comparable, and the fourth sale was questionable as to whether the sales transaction was arm's length. Plaintiffs failed to prove by a preponderance of the evidence that the properties identified by Plaintiffs are, in fact, comparable to the subject property.
Even though Plaintiff failed to carry its burden of proof and the "burden of going forward with the evidence" has not shifted, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence pleaded by the parties". ORS 305.427; ORS 305.412. For the January 1, 2009, and January 1, 2010, assessment dates, Defendant's appraiser determined real market value based on the listing prices for the subject property. For this appeal, Defendant's appraiser prepared an appraisal report relying on two sales completed in 2007. For each of those sales, Defendant's appraiser made a time adjustment, stating that land values declined one percent per month in 2008. For January 1, 2010, Defendant reduced the subject property's real market value 50 percent or more than 4 percent per month from January 2009 to January 2010. Defendant's appraiser failed to provide the court with a sales ratio study or other evidence to support the time adjustment stated in his appraisal report or to address Plaintiffs' question as to the evidence that would support a 50 percent reduction in real market value between the 2009-10 assessment date and 2010-11 assessment date. Because there is no evidence for the court to consider and because Defendant does not have the burden of proof, the court cannot determine if Defendant's time adjustments are correct. The court cannot order a change to the tax roll. *Page 13 
 III. CONCLUSION
After careful review of the testimony and evidence, the court concludes that Plaintiffs failed to carry their burden of proof. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.
Dated this ___ day of June 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on June 9, 2011. The Court filed and entered this documenton June 9, 2011.
[1] Tax lot 109 is recorded in two accounts, 10989028 and 10991209, and was appealed in TC-MD 100331D and 100332D, respectively.
[2] References to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to year 2007. *Page 1