IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

WATUMULL PROPERTIES CORP.;      )
MICRO SYSTEMS ENGINEERING INC.; )
BIOTRONIK, INC.; and MICROSYSTEMS )
ENGINEERING,                     )
                                 )
            Plaintiffs,          )      TC-MD 130314D
                                 )
      v.                         )
                                 )
CLACKAMAS COUNTY ASSESSOR,       )
                                 )
            Defendant.           )      **FINAL DECISION**

The court entered its Decision in the above-entitled matter on February 4, 2014. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiffs appeal the 2012-13 real market value of property identified as Accounts 00339075, 00339182, 01682389, 00339173, 05023089 and P2107777. As of the date of trial, November 18, 2013, the parties stipulated to 2012-13 real market values for Accounts 00339182, 00339173 and 01682389, and Plaintiffs' withdrew their appeal of Accounts 05023089 and P2107777. Account 00339075 (also referred to as Tax Lot 201) including three buildings (Buildings A, B and C) is the subject property of this Decision.

A trial was held in the Oregon Tax Courtroom, Salem, Oregon on November 18, 2013. Christopher K. Robinson, Attorney at Law, appeared on behalf of Plaintiffs. Jeff L. Grose (Grose), MAI and Executive Managing Director, Valuation and Advisory Services, Colliers International, testified on behalf of Plaintiffs. Kathleen J. Rastetter, Senior County Counsel,

/ / /

Clackamas County, appeared on behalf of Defendant. Ronald R. Saunders (Saunders), Registered Appraiser, Clackamas County, testified on behalf of Defendant.

Plaintiffs' Exhibits 1, 4 and 5 and Defendant's Exhibits A, B and C were admitted without objection. Plaintiffs' Exhibit 3 was admitted with Defendant's comment that the photographs represented to be of Defendant's comparable properties 4 and 7 did not look like Defendant's photographs. Plaintiffs' Exhibit 2 was admitted over Defendant's relevance objection.

## I. STATEMENT OF FACTS

The subject property is located in the Lake Oswego Commerce Center on Jean Road in Lake Oswego. (Ptfs' Ex 1 at 2; Def's Ex A at 2, 7, 14.) The parties agreed that the subject property built in 1978 contains approximately 100,200[1] square feet of net rentable area. (Ptfs' Ex 1 at 2; Def's Ex A at 13.) The parties agreed that the "subject property has a multi-tenant design that had an occupancy level of 100.0% as of the date of value" and that the "single tenant has leased the entire subject property into 2022 with options to extend and an early termination option in April 2016." (Ptfs' Ex 1 at 2-3; *see* Def's Ex A at 3.) Neither party assigned any value to 6,000 square feet of "mezzazine" space located in Building B. (Ptfs' Ex 1 at 14; Def's Ex A at 11.) Both parties acknowledged that 18,000 square feet in Building C was leased to a bakery (Cargill Bakery) as of the assessment date; that tenant no longer occupies that portion of the building. (Ptfs' Ex 1 at 36; Def's Ex A at 3.)

The parties agreed that the basic construction was concrete tilt-up with wood beam interior framing and flat roofs. (Ptfs' Ex 1 at 36; Def's Ex A at 44.) The parties disagreed about the value of the build-out to the market. Grose testified, stating that:

---

[1] Plaintiffs' appraisal report stated 100,572 square feet of net rentable area. (Ptfs' Ex 1 at 2.) Both parties agree that the difference between the net rentable area is not material.

"[Building C] has some minor build-out that was in dated condition and is treated as shell space in this analysis. The majority of the build-out in the remainder of the subject property was constructed/designed by the current single-tenant and offers good utility to this user; however, the level of build-out is well above market standards. The build out was primarily tenant-paid and is somewhat specialized to the specific needs of the tenant. To an alternative tenant/user these improvements would have less utility and much of the interior build-out would likely be removed if the tenant were to vacate. This is considered in the valuation."

"* * * * *

"The tech lab build-out of the subject property is somewhat unusual for the Lake Oswego market area. Most labs of similar build-out are located to the west/northwest in the Sunset Corridor (Beaverton/Hillsboro) and technology users have shown a strong preference to that submarket over the past few decades. * * * Most users would likely desire to convert the lab areas [(18 percent of the subject property[2])] to production areas of their own and/or remove them in favor of more open warehouse space. These considerations are factored into my analysis in the Valuation portion of the report."

(Ptfs' Ex 1 at 3, 36.) Grose testified that the subject property's build-out is "functional obsolescence." Saunders stated in his appraisal report that:

"The buildings have been converted from warehouse uses to office/R&D [flex space] uses over the years. * * * There is adequate site area and parking spaces for this existing use. * * * There are no apparent adverse influences.

"* * * * *

"There is demand for flex space in the market which is built-out at 80-100% as will be shown by the lease comparables in the Income Approach section later in this report."

(Def's Ex A at 45, 65.) The parties discussed the definition of "flex space." Grose testified that industrial flex "kicks in" when office space is "30 percent or more." Defendant offered Exhibit B, referencing the CoStar Industrial Report definition:

"Flex Building: A type of building designed to be versatile, which may be used in combination with office (corporate headquarters), research and development, quasi-retail sales, and including but not limited to industrial, warehouse, and

---

[2] Saunders determined that 30.79 percent of the subject property's "Building Area" was "Lab/Processing[.]" (Def's Ex A at 14.)

distribution uses. A typical flex building will be one or two stories with at least half of the rentable area being used as office space, having ceiling heights of 16 feet or less, and have some type of drive-in door, even though the door may be glassed in or sealed off."

(Def's Ex B at 4.) Saunders testified that the subject property is "flex," not "industrial" and "the use changed when it was 100 percent built-out."

Saunders stated that the subject property has "266 open asphalt parking spaces on the site for a parking ratio of 2.65 spaces per 1,000/SF GLA [square foot gross lease area]." (Def's Ex A at 45.) Grose stated in his appraisal report that the "site coverage and parking ratios [(3.33 per 1,000 SF for general office use)] are within market standards for industrial space; however, it is noted that the subject does not have adequate parking for a high office build-out." (Ptfs' Ex 1 at 37, 39.) "The local street configurations and limited truck courts on the subject property would mean that the subject property would be less functional for users with a significant need for distribution or other trucking services." (*Id.* at 37.)

Both parties agreed that the highest and best improved use was the subject property's continued use. (*Id.* at 46; Def's Ex A at 65.) In valuing the subject property, both parties placed primary consideration on the income approach and relied on the sales comparison approach to support their income approach value conclusion. Saunders testified that he did not consider the cost approach because of the "lack of land sales [and] difficultly in determined accrued depreciation."

For the income approach, the parties relied on different lease transactions in determining potential gross annual income with Grose concluding $963,531 including reimbursements and Saunders concluding $901,800. (Ptfs' Ex 1 at 54, 66; Def's Ex A at 92-93, 101.) Grose testified that in determining the 60 cents per square foot per month lease rate, he concluded that the "blended rental rate [] factors in the comparable analysis, preceding discussion of the market's

willingness to recognize and pay premiums to high levels of office space in a business park, and the lease terms negotiated with the subject's current single-tenant occupant." (Ptfs' Ex 1 at 58.) Defendant challenged Grose's conclusions that "applying a full premium to the subject's specialized build-out would result in an above market rent conclusion." (*Id.* at 56; Def's Ex C.) In response, Grose testified that "60 cents is the effective value of [subject property's] build out."

Saunders testified that based on the seven leases he reviewed, "the subject property would lease for an average rental rate of $9.00 SF." (Def's Ex A at 101.) Saunders testified that he rejected contract rents, stating that the "lease renewals were tied to Plaintiffs renting more space and taking a greater portion of Lake Oswego Commerce Center." Plaintiffs challenged Saunders choice of properties, noting that most of the properties are located in the "Sunset Corridor," had brick facades, some buildings were more than one story and newer than the subject property. Plaintiffs asked Saunders why he did not adjust the rent rates for "free rent" and explained that if rental rates were adjusted for "free rent," the effective rental rates would be lower. Saunders responded, stating that "you don't adjust for free rent unless outside the norm." Saunders was asked where he found data to support conclusion that office rates were the same as lab space rental rates; he testified that he found none.

Grose determined a vacancy and credit loss percentage of 6 percent and Saunders determined 10 percent. (Ptfs' Ex 1 at 66; Def's Ex A at 101.) Grose determined an expense ratio of 27.1 percent or $2.60 per square foot per month. (Ptfs' Ex 1 at 61-62, 66.) Grose's expense ratio included real estate taxes, stating the "conclusion is based on the concluded value in the Income Approach multiplied by the 2012 tax rate." (*Id*. at 62.) Saunders's report stated that an "estimated annual operating expense of 6% will be utilized in this analysis." (Def's Ex A at 102.) Grose's determined net operating income was $644,181 and Saunders's determined net

operating income was $762,923. (Ptfs' Ex 1 at 66; Def's Ex A at 103.) Grose determined a capitalization rate of 8.25 percent and Saunders determined a capitalization rate of 8.5 percent, stating that rate was "more conservative." (Ptfs' Ex 1 at 63-65; Def's Ex A at 102.) After applying a capitalization rate to net operating income, Grose concluded that the subject property's indicated value was $7,810,000 and Saunders concluded $8,975,565. (Ptfs' Ex 1 at 66; Def's Ex A at 103.) Each party confirmed that the indicated value was their requested real market value.

Both parties prepared a sales comparison approach. (Ptfs' Ex 1 at 68-74; Def's Ex A at 67-77.) Grose determined an indicated value of $7,540,000 and Saunders determined an indicated value of $8,517,000. (Ptfs' Ex 1 at 74; Def's Ex A at 77.) Grose testified that he selected six properties as comparable to the subject property, with sale prices ranging from $62.61 per square foot to $121.13 per square foot. (Ptfs' Ex 1 at 74.) He stated that the "sales presented are all leased fee transactions [and] reflect a higher value than what would be paid on a fee simple basis." (*Id*.) Grose testified that in selecting comparable properties, he considered "location, percentage of office build-out, parking ratio and age," noting that all the "comparables are newer than the subject property." Defendant asked Grose about the number of loading doors present in comparable properties 1 (98 loading doors) and 6 (47 loading doors), noting that the subject property's building C has no more than 6. After considering the subject property's "high level of office/lab build-out that would appeal to a small number of users," Grose concluded a $75 per square foot value. (*Id*.)

Saunders selected six properties as comparable to the subject property; three of those properties were selected by Grose. (*Id*. at 69; Def's Ex A at 69.) Saunders "unadjusted price per SF range[d] from $80.31 to $121.13 SF." (Def's Ex A at 68.) Saunders testified that:

"[c]onsideration has been given to each sale for differences between the sale and the subject property for ownership interest, date of sale, location, design, quality, age, condition, parking ratio, land to building ratio, etc. Since it was not possible to isolate specific dollar adjustments from the market for these differences, a bracketing technique was used to value the subject property."

(Def's Ex A at 75.) Saunders testified that in his opinion the "subject property would sell for $8[5].00 SF."[3] (*Id*. at 77.) Plaintiffs challenged Saunders comparable properties, noting that each property had parking ratios in excess of the subject property's ratio and that Saunders made "no adjustment for time and parking."

## II. ANALYSIS

The issue before the court is the 2012-13 real market value of Plaintiffs' property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D at 4 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[4] which reads: "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007(2).

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three approaches of value that must be considered, although all three may not be applicable in a given case. OAR 150-308.205-(A)(2)(a). The three approaches are: (1) the cost approach,

---

[3] Saunders testified that the price per square foot ($82.00) stated in the report was a typographical error; the correct amount was $85.00. (Def's Ex A at 77.)

[4] The court's references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

(2) the sales comparison approach, and (3) the income approach. *Id.* The parties agreed that the cost approach is not applicable and each party concluded that the income approach should be given primary consideration.

"Any property that generates income can be valued using the income capitalization approach." *NYEI v. Umatilla County Assessor*, TC-MD No 100605D at 19 (Jan 13, 2012) (citing Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2008)). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. (citing *The Appraisal of Real Estate* at 445.) "Anticipation is defined as 'the perception that value is created by the expectation of benefits to be derived in the future.' " *Id*. (Citing *The Appraisal of Real Estate* at 35.) Because the primary use of the subject property is a commercial business, both parties determined the subject property's real market value using the income approach.

Both parties relied on the direct capitalization method to determine expected future income. "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Allen v. Dept. of Rev. (Allen),* 17 OTR 248, 253 (2003). Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id*. at 254 (citation omitted). "To calculate the [net operating income] appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id*. at 254.

The main difference in the subject property's value determined by each party's appraiser is linked to potential gross income. Grose determined "total rental income" to be $724,118 and Saunders' determined "total potential gross annual income" to be $901,800. (Ptfs' Ex 1 at 66; Def's Ex A at 103.) In arriving at their potential gross annual income, the leases considered by each

appraiser to be comparable to the subject property were substantially different. Grose identified properties as comparable to the subject that showed more industrial use than the subject property and Grose computed a blended rate, concluding that there is "a shallow pool of potential users that would place full value on the [subject property's] additional improvements." (Ptfs' Ex 1 at 56.) Saunders' "lease comparables" were primarily located along Sunset Highway (in an area identified by both parties as "high tech"), and most properties were built in the late 1990s and identified as Class A or B office. (*See* Def's Ex 1 at 92-93, 99-100; *see* Ptfs' Ex 4.) The subject property was built in the late 1970s, is located in the Lake Oswego Commerce Center and the buildings are primarily used as offices with a small percentage of lab space. After careful consideration of the evidence and testimony, the court concludes that the subject property's average rental rate would be no more than 70 cents per square foot per month or $8.40 per square foot.

Grose determined the subject property's operating expenses after reviewing "business park properties in the Portland area for 2010 and 2011" and the "subject's historical expenses." (Ptfs' Ex 1 at 61.) The parties agree that the subject property is "leased on a triple net basis" where "the landlord pays for structural maintenance (*i.e.* capital reserves) [and the] tenant reimburses all other operating expenses including taxes, insurance, repairs and maintenance, utilities and management fees[.]" (Ptfs' Ex 1 at 60; *see* Def's Ex A at 102.) Grose's analysis deducted all of the expenses that are deemed reimbursed by the tenants and added tenant reimbursement for some, but not all operating expenses. (*Id*. at 60.) The net result is an expense ratio of 2.5 percent of effective gross income. Saunders concluded that an "estimated annual operating expense of 6% will be utilized in this analysis." (Def's Ex A at 102.) Based on the limited commentary in his report, Saunders's 6 percent estimate appears to be a combination of "fixed expenses during the vacancy period" and "reserves for replacement." (*See id*.) The court accepts Saunders estimate of annual operating expense, noting that it incorporates the potential that the market might not positively view the subject property's build-out.

The court concludes that using the income approach the subject property's real market value as of the assessment date was $8,300,000 (rounded).

Both parties' appraisers concluded lower real market values for the subject property using the sales comparison approach than the income approach. Both appraisers gave the income approach primary consideration in determining the subject property's real market value. The court accepts the parties' determination that the income approach should be given primary consideration.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the subject property's real market value was $8,300,000 for the 2012-13 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2012-13 real market value of property identified as Account 00339075 is $8,300,000.

IT IS FURTHER DECIDED that, as stipulated by the parties, the 2012-13 real market value of Account 00339182 is $3,920,000; Account 00339173 is $1,345,140; and Account 01682389 is $1,266,010.

IT IS FURTHER DECIDED that Plaintiffs withdraw their appeal of Accounts 05023089 and P2107777 for tax year 2012-13.

Dated this ____ day of February 2014.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR. Your Complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.*
*This document was signed by Presiding Magistrate Jill A. Tanner on February 20, 2014. The Court filed and entered this document on February 20, 2014*