DECISION
Plaintiff appeals the real market value of property identified as Accounts 000111, 021625, 000087, 000129, 000269, 000293, 333274, 000681, 407155, and 000285 (subject property) for tax year 2009-10. A trial was held in the Oregon Tax Courtroom, Salem, Oregon on May 2, 2011. Gary E. Norman, attorney at law, appeared on behalf of Plaintiff. Matt S. Peltier (Peltier), G.C.S., head superintendant, Springhill County Club, testified on behalf of Plaintiff. Vance Croney, Benton County Counsel, appeared on behalf of Defendant. Fred O'Banion (O'Banion), MAI, senior appraiser analyst, Oregon Department of Revenue, testified on behalf of Defendant.
Plaintiffs Exhibit 1 and 2 were admitted with objection and Defendant's Exhibit A was admitted without objection.
 I. STATEMENT OF FACTS
The subject property is described by O'Banion as "an 18 hole country club style golf course, which is improved with a clubhouse, driving range, Olympic swimming [pool], and ancillary improvements," including a children's wading pool. (Def s Ex A at 4.) The clubhouse is a two-level 21,264 square foot building housing a "kitchen, the Player's Grill Pub, The Caddy Shack Bar (over 21 years), Fitness room, men and women's locker rooms and restroom * * * on *Page 2 
the 1st level (Partial Basement), [and] * * * corporate board room, formal dining room, corporate offices, and Bar * * * on the 2nd level." (Id. at 23-24.) The subject property is centrally located in the Willamette Valley in an "Exclusive Farm Use [zone] and has a conditional use permit" to operate "a par 72 public golf course measuring a total of 6,502 yards from the championship tees." (Id. at 4.) The subject property is "irrigated by a fully automated rain bird system" and the "source of irrigation water is from parcel 000087 located on the Willamette River water edge and an on-site pump." (Id. at 23.)
Peltier, who has supervised the construction of golf courses and management of both public and private golf courses, testified that, in April 2010, he became a part owner in the subject property. Peltier referred to the subject property as Springhill County Club and distinguished its operation from a public golf course that does not offer the same "fine dining and other amenities" as the subject property. O'Banion agreed with Peltier, testifying that the subject property's clubhouse facilities "are equivalent to a resort." O'Banion testified that "it costs quite a bit" to operate and he concluded that it "did not add to the value." Peltier testified that the subject property has "members" that pay "membership dues," granting "rights" to those individuals to use the clubhouse, restaurant, sauna, recreation room and swimming pool. O'Banion testified that the subject property is "not an equity course," explaining that individuals do not buy membership rights that are refunded when they decide to cancel their membership; he testified that the subject property is "open to the public at any time." Peltier testified that the subject property's dining room "hosted" more than "100 parties a year" for "corporate holiday parties, corporate retreats, realtor events, weddings, and other special occasion events." *Page 3 
Peltier testified that the document titled "Spring Hill Country Club — Pro Form Revenue and Expense Summary" could have been generated to reflect the subject property's operations. (See Ptf's Ex 1 at 43.) He testified that he had not prepared the document, but believes the "figures are fair."
O'Banion, who described himself as a real estate developer until 2003 and a registered appraiser who first appraised golf courses in 1974, reviewed the appraisal report he prepared for the subject property in detail. (Def's Ex A.) O'Banion testified that "2000 was the peak year for the number of rounds played on an 18 hole golf course" and, as of 2008, there was "a 8.5 percent decline in the number of rounds played." He reviewed the subject property's characteristics, testifying that in January 5, 2005, the subject property was purchased by Plaintiff for $4,559,012. O'Banion concluded that the highest and best use of the subject property was its current use as a public golf course because a highest and best use vacant "given the current price per acre for EFU" is less than the highest and best use improved.
O'Banion testified that he considered the three valuation approaches of cost, market, and income. He concluded that the cost approach is not applicable because a cost of "$7 million to $8 million far exceeds the [subject property's] economic potential." He "used [the cost approach] to distribute the overall value conclusion to the applicable land, onsite and improvements." (Def's Ex A at 29.)
O'Banion testified that the "[m]arket approach is based on the principle that a prudent investor would pay no more for a property than the cost of acquiring a satisfactory substitute of similar utility." (Def's Ex A at 31.) He testified that the "consistent unit of comparison utilized *Page 4 
by most buyers and sellers is the total revenue multiplier." (Id.) O'Banion testified that, after reviewing "over twenty sales" that did not include "equity clubs or foreclosed properties," he concluded that "[t]he only sales that are reflective of top run courses are in order 3, 5 and 9 (notice the expenses, rounds and rates are in stabilization). Therefore the conclusion is a 2.5X Total Revenue Multiplier." (Id. at 31-32.) He testified that the "2.5X Total Revenue Multiplier" results in a "lower value" than the "3.01 mean" determined from the six properties that he identified were "operated within a reasonable operating sphere." (Id. at 42.) O'Banion described three properties, with sale dates of January 2006, May 2007, and February 2008, that he concluded were most comparable to the subject property. (See Def's Ex A at 35, 37, and 41.) He characterized those sales as "not problem sales" and the properties were "stabilized." O'Banion determined a real market value of $3,437,500 using the market approach based on 25,000 rounds played at $55 per round multiplied by a 2.5 total revenue multiplier. (Id. at 43.)
In discussing the income approach, O'Banion reviewed information set out for each comparable sale in his appraisal report and titled "Fees, Utilization Expenses." He used that information to compute a stabilized number of golf rounds played, golf revenue per round and expense ratio. (Id. at 35, 37, and 41.) He determined total revenue of $1,375,000, using 25,000 golf rounds played and $55 per golf round. (Id. at 52.) O'Banion testified that, in determining the golf rounds played and price per golf round, he "made some assumption, not all correct but reasonable." He testified that the subject property reported 23,000 rounds of golf played in 2007 and 2008. O'Banion acknowledged that "the number of rounds played is dropping," but concluded that 25,000 rounds played represents a "stabilized" number and fits with "the other *Page 5 
two golf courses." He testified that he "reverified with club owners the rounds played and reviewed gross revenue with them." O'Banion testified that, "based on the subject's filed tax returns, Spring Hill's revenue per golf rounds played in 2009 was $100.01." (Id. at 51.) In deciding to use 25,000 rounds and $55 per golf round, O'Banion testified that he acknowledging that the "industry was in a kind of tail spin, a 10 year downward trend" and he was "giving the taxpayer a lower value." In response to the question of why he did not use the subject property's actual income, O'Banion testified that, if he had used the subject property's actual revenue, the "determined real market value would have been $4,400,000," a real market value greater than he determined.
O'Banion testified that expenses ratios range from "70 percent to 80 percent" and he selected "77 percent as the average expense ratio." (See id. at 44.) He testified that the expense ratio included property tax expense. O'Banion computed a net operating income of $323,125. (Id. at 52.) In determining a capitalization rate, O'Banion testified that he selected 9.5 percent, relying on the three comparable properties he selected. (See id. at 45.) He did not increase the capitalization rate for the subject property's property tax rate. Applying the 9.5 percent capitalization rate to the $323,125 net operating income, O'Banion determined that the subject property's real market value was $3,401,316, including personal property valued at $265,671, as of the assessment date, January 1, 2009. (Id. at 52, 55.) O'Banion determined that the subject property's real market value using "Direct Capitalization with Effective Tax Rate" as of the assessment date was $3,339,004. (Id. at 53.) *Page 6 
O'Banion was asked questions about an appraisal report offered by Plaintiff and admitted into evidence. The individual who prepared the appraisal report did not testify. In response to questions, O'Banion read the following from the appraisal report:
 "10. Todd H. Finney, MAI has not made a personal inspection of the property that is the subject of this report."
(Ptf's Ex A at i.) The report was signed by Todd H. Finney. O'Bannion commented that he "had never conducted an appraisal without inspection." He further read from the appraisal report:
 "The purpose of this appraisal is to estimate the `as is' market value of the subject property, as a going-concern, as of January 1, 2009."
(Id. at 1.) O'Banion testified that Oregon requires that property be appraised at "real market value" whereas "`as is' implies an intangible nature of business." He testified that the appraiser erroneously "assumed" that the subject property was a "private country club because there is no contractual obligation to pay back those who join; there was no equity membership." O'Banion read:
 "It is noted that we have not summarized or discussed operating data for public golf courses since the operation of a public course involves some very different revenue and expense characteristics."
(Id. at 44.) He testified that the subject property is a public course.
The appraisal report primarily relied on the income approach to determine the subject property's value. (Id. at 30.) O'Banion pointed out that the appraisal report stated "that our expense comparable information is confidential and course names and certain details cannot be revealed." (Id. at 39-40.) Plaintiff pointed out that the appraiser did a "line by line analysis of the subject property's expenses" whereas Defendant "used comparable sales" to determine an expense ratio. (See id. at 39-42.) O'Banion testified that there "is no evidence in the appraisal report" submitted by Plaintiff "to support its findings." O'Banion noted that the report relied on *Page 7 
an "Investor Survey by RealtyRates.com" to determine a capitalization rate. (Id. at 44.) O'Banion testified that RealtyRates.com is "not an industry standard" and he was "unaware of that site."
O'Banion was asked questions about the golf courses he identified as comparable to the subject property. (See Def's Ex A at 51.) He was asked about the source of the "golf rounds played" and the comparable of other properties to the subject property which is "country club rated." He acknowledged that Trysting Tree does not have "the same banquet facility" as the subject property and it is "owned by Oregon State University" and there could be some "intangible good will associated with OSU." O'Banion testified that in determining real market value "goodwill is removed." O'Banion concluded that three golf courses — Redmond Ridge, Cedars @ Dungen and Widigi Creek — are "problem courses." (Id. at 42.)
Plaintiff criticized O'Banion for determining a real market value that is not "comparable to what a potential buyer would pay" for the subject property. Plaintiff concluded that a potential buyer would not pay more than $2 million for the subject property. Plaintiff contrasted the value determined in its appraisal report which "reflects the business acumen of the operators" and stated that the "value of the golf course business should be determined as it is." Plaintiff concluded that "O'Banion appraised a business that does not exist." Defendant responded that O'Banion "valued the real estate for purposes of assessing tax." Defendant stated that "how well the owners are running the business is not at issue."
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of Plaintiffs' property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 *Page 8 
at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev.,13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
Real market value as defined above "should be distinguished from other definitions. It is the value based on market worth rather than investment expectation or insurance value. See Appraisal Institute, The Appraisal of Real Estate, 20-21 (12th ed 2001)." Chart DevelopmentCorp. v. Dept. of Revenue,16 OTR 9, 12, (2001) (Chart). Plaintiff submitted an appraisal report using the income approach to determine an "As Is, Fee Simple" value conclusion. (Ptf's Ex A, Ltr at 1, Apr 13, 2011.) Plaintiff's appraisal report defined
 "Value as is: The value of specific ownership rights to an indentified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical conditions or possible rezoning."
(Id. at 3 (citation omitted).) That definition is not the same as the statutory definition of real market value. Plaintiff's "as is" value does not include a stabilized income for the subject property which would be the one critical factor in an arm's length transaction between a willing buyer and willing seller. Plaintiff's approach does not necessarily determine a value "based on market worth." Chart, 16 OTR at 12. There is no evidence showing that Plaintiff's approach determined a real market value based on the market.
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. *Page 9 
Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence."Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. of Rev, 4 OTR 302 (1971)). Plaintiff failed to carry its burden of proof.
Even though Plaintiff failed to carry its burden of proof and the "burden of going forward with the evidence" has not shifted, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.427; ORS 305.412. Defendant determined a real market value of $3,135,000 for tax year 2009-10, a value less than the tax roll value. (Def s Ex A at 5.) O'Banion concluded that the highest and best use of the subject property was its current use as a public golf course. (Id. at 28.) He placed the most weight on the income approach. O'Banion's income approach established stabilized rounds, 25,000, in excess of an amount reported by the subject property in the two prior years and substantially more than reported, 19,449, in 2009. (Id. at 51, 52.) His income approach included property taxes in the expense ratio and a capitalization rate that did not include an effective tax rate for property taxes. (Id. at 52, 53, 55.) This court has indicated a preference for an income approach that removes property taxes from expenses and uses a capitalization rate that includes an effective tax rate for property taxes.
At trial, the court expressed its concern that O'Banion's appraisal report failed to value the two distinct uses of the subject property: a golf course and other entertainment for business or family leisure. O'Banion concluded that the subject property's highest and best use was a "public golf course." There is no dispute that the subject property is a public golf course. However, the subject property has another use. O'Banion makes no mention of that use, omitting it from his determination of the highest and best use of the subject property but offering no evidence that it is not a highest and best use. In valuing the subject property, O'Banion *Page 10 
elected to reduce the revenue per round to reflect the combined uses of the subject property without analyzing the contribution of each use to the subject property's real market value. As a result, Defendant overvalued the subject property.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. Given the statutory directive that the "court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties," the court determines that the 2009-10 subject property's real market value, excluding personal property, is $2,500,000. Now, therefore,
IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of property identified as Accounts 000111, 000087, 000129, 000269, 000293, 333274, 000681, 407155, and 000285 is $2,500,000; and
IT IS FURTHER DECIDED that the 2009-10 real market value of personal property identified as Account 021625 is $265,671.
Dated this ___ day of July 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on July 5, 2011. The Court filed and entered thisdocument on July 5, 2011.
[1] References to the Oregon Revised Statutes (ORS) are to year 2007.
 *Page 1