IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CLACKAMAS COUNTY ASSESSOR,      )
                                              )
           Plaintiff,                 )   TC-MD 100701D
                                              )
      v.                              )
                                              )
WILSONVILLE 2006 SE LLC,        )
                                              )
           Defendant.          )   **DECISION**

Plaintiff appeals the Clackamas County Board of Property Tax Appeals' Order, dated April 5, 2010, stating that the real market value of property identified as Account 05005691 (subject property) was $16,363,230 for tax year 2009-10. A trial was held in the Oregon Tax Courtroom, Salem, Oregon on October 6, 2011, and October 11, 2011. Kathleen Rastetter, Assistant County Counsel, Clackamas County, appeared on behalf of Plaintiff. Ronald R. Saunders (Saunders), Registered Appraiser, Clackamas County, testified on behalf of Plaintiff. Christopher Robinson, Attorney at Law, appeared on behalf of Defendant. Steward Cliffton Peterson (Peterson), commercial broker and partner, Macadam Forbes, and Richard P. Herman (Herman), MAI, FRICS, member, R. P. Herman & Associates LLC, testified on behalf of Defendant.

Plaintiff's Exhibit 1, pages ii-vi and 1-166, 201-230, 418, 446-466, 568-575, 582-586, Exhibits 2, 6, 8, 9, and Declaration of Debra Cobun and Defendant's Exhibits A, B, C, G, H, and I were offered and admitted.

## I. STATEMENT OF FACTS

The subject property was described by Herman as:

"a one and two story, single tenant, flexible occupancy/research and development

industrial building which was completed in late 2008. It is entirely occupied by Rockwell Collins Aerospace & Electronics, Inc. The building structure consists of tilt-up stained concrete walls which have been thickened in order to accommodate abundant fenestration. The building walls are typically 24 – 28 feet in height. The main floor level and footprint is approximately 101,056 square feet in size and has been built-out to tenant specifications with executive and platform office space, a research and development laboratory, assembly and testing rooms, meeting/conference rooms, equipment repair facility, executive offices, employee cafeteria, restrooms and equipment alcoves. The upper floor level has approximately 23,394 square feet of floor area which primarily supports executive office suites and platform office cubicles. * * * [T]he site is professionally landscaped and supports a 465 space asphalt surfaced parking lot.

"The subject site has an area of approximately 8.76 acres, * * *. The easternmost 100 feet of the parcel is an undevelopable buffer zone/conservation easement. The developable area of the site approximates 7.0 acres. * * *. It is zoned Planned Development – Industrial."

(Def's Ex A at 5, 6.)[1] Saunders concluded that "[t]here are no comparable properties in the Portland PMSA." (Ptf's Ex 1at iii.). Peterson testified that the subject property is a "crossover building with offices and labs." Peterson testified that the first floor of the subject property is a "catacomb" of offices and cubicles whereas the second floor is "much nicer" because it is "open."

A.      *Highest and Best Use*

Both appraisers, Herman and Saunders, agree that the highest and best use of the subject property as improved is, as described by Saunders, a "light industrial/flex type R & D property for Rockwell Collins." (*See* Ptf's Ex 1 at 41.) Herman testified that the subject property's "interior build-out * * * is unique to the tenant," noting that "it is a first generation build-out." (*See* Def's Ex A at 28.) He concluded that "there are no physical or functional features of the building shell that adversely influence the market position of the building." (*Id*.)

///

---

[1] Saunder's Summary Appraisal Report provides similar information in Exhibit 1 at pages iii, iv, 7.

Saunders testified that the subject property's tenant "spent $3,045,992 in additional specialized tenant improvements to finish the building for their specific aerospace and electronics division needs. "If Rockwell Collins were to vacate the building, the specialized tenant improvements would have limited value to an alternative user." (Ptf's Ex 1 at 41.) The parties agree that the property owner "has no right to make the tenant remove" the tenant improvements during the lease or when the lease terminates.

After extensive testimony, the parties conceded that as of the assessment date, January 1, 2009, the structure was 100 percent complete and approximately 70 percent of the building is used as "office."

B.      *Valuation Approaches*

Both Saunders and Herman testified that in determining the subject property's 2009-10 real market value, "All three approaches to value were considered," the cost, sales comparison or and income approaches to value." (Ptf's Ex 1 at iv; Def's Ex A at 5.)

1.      *Cost Approach*

Saunders testified that he selected four land sales as comparable to the subject property's "327,136 SF net useable portion of the subject site." (Ptf's Ex 1 at 44.) The four land sales ranged in size from 246,550 square feet to 483,080 square feet and the "Transaction (Status/Date)" occurred from December 2007 to September 2008. (*Id*.) Saunders concluded that the "sales range from $6.00 to $8.77/SF" and those sales are "[g]ood support * * * for a unit value of $8.50/SF in comparison." (*Id*. at 45.) He stated that, "When the subject's 327,136 SF i[s] multiplied by $8.50/SF the indicated market value of the land as of January 1, 2009 was $2,780,656." (*Id.*) Saunders noted that, "The developer's purchase of the subject property for $7.64/SF ["on June 5, 2006 for $2,500,000 cash"] supports the reasonableness of the appraiser's

value estimate of $8.50/SF for the subject site in comparison." (*Id*.) In response to questions, Saunders testified that none of the sale prices were adjusted "for trend" even though he agreed that land sale prices were declining after 2007. He testified that his adjustments were "qualitative," not "quantitative," and there were no "match sales."

Herman concluded a land real market value of $2,500,000 that he stated was "the actual allocation made to the subject site relative to the purchase of a larger parcel that was subsequently partitioned." (Def's Ex A at 59.) He further stated that "[t]he unit value equivalent of $8.20/developable square foot is corroborated by other industrial land sales that have transacted in the general market area, examples of which have been included in the Addenda." (*Id*.) Herman offered no testimony about the "other industrial land sales" transactions referenced in his appraisal report, labeled Defendant's Exhibit A. In response to questions directing him to his Exhibit A-193 showing a 5 acre parcel listed for $16.78 per square foot, Herman testified that the "$2,500,000 is reasonable and supportable by sales" and listings are not sales.

Saunders testified that he relied on "the State Farm Insurance Company appraisal" for "Direct Costs," "Indirect Costs," and "Other Costs excluding entrepreneurial profit." (*See* Ptf's Ex 1 at 46.) Defendant objected to Saunders reliance on an appraisal report prepared by someone who was not present to testify and there was no written authorization given to Saunders to use that appraisal. The court agreed with Defendant, stating that without testimony from the person who prepared the appraisal report, the reliability of the information is unknown and the document has not been authenticated.

Herman testified that the subject property's "Total Structure Cost/Profit" including a "Developers Profit (8%)" was $13,687,002. (*See* Def's Ex A at 59.) When questioned, Herman testified that he relied on Perlo Construction reported construction cost of $6,130,520 for the

"direct shell." (*See id.* at 147.) He testified that to that amount he added the lease agreement tenant improvement allowance of $4,393,085 and "soft costs" of $2,150,065. (*See id.* at 59, 147.) He concluded a rounded "Total Project Cost" (land and building) of $16,187,000. (*See id.* at 59.) Herman testified that the cost approach results in an "upper threshold of value."

The parties agree that a "developers' profit" or "entrepreneurial profit" is hard to estimate. Herman testified that the developer told him that he would have estimated a "much lower" profit. Herman testified that he did not add "the excess" payment by the tenant for improvements in excess of the amount reimbursed by the property owner to the tenant for such improvements to the total building cost. Saunders testified that he does not agree that those costs should be excluded because the owner "couldn't finish the building without spending more than the tenant improvement allowance." He concluded that the property owner could not "purchase a property" at January 1, 2009, that was "equal to or similar to subject property for less than the replacement cost of $22 Million to $23 Million." Herman testified that he does not "agree" that the cost approach is most applicable even, though the property was completed close to the assessment date, because the "market expectations" shifted as of the assessment date.

2.    *Sales Comparison Approach*

Saunders testified that after conducting research "in the Portland metropolitan area to locate sales of similar industrial property[,]" he included "five sales and one listing that occurred during 2006, 2007 and 2008 which have varying degrees of comparability to the subject property." (Ptf's Ex 1 at 49.) In his appraisal report, Saunders stated:

> "The subject property will be compared to the other comparable sales based on 124,450 SF GLA with 40.1% office build-out with the balance of the subject's manufacturing, testing and production areas also being 100% build out, but at a lower quality than typical office space. * * *.
>
> "* * * * *

> "The fee simple interest in the subject property will be valued with no consideration given to the long term lease agreement. * * *. All sales were verified with either the buyer, seller, or brokers involved in the transactions. * * *.
>
> "Consideration has been given to each sale for differences between the sale and the subject property for ownership interest, date of sale, location, design, quality, age, condition, etc. Since it was not possible to isolate specific dollar adjustments from the market for these differences, a bracketing technique was used to value the subject property."

(*Id*. at 57.)

Saunders testified that the "office/flex buildings * * * range in building size from 51,110 SF to 126,180 SF GLA" and the "co-star comp sheets are in the county's database." (*See id*. at 50.) The price per square foot for the five sales ranged from $159.49 to $236.74. (*Id*.) Saunders testified that he included one property listed for sale because it "became vacant on December 1, 2008, one month before the date of valuation." (*See id.* at 49.) He testified that the property was "listed above market" at $175 per square foot based on its "age, quality and condition." (*Id*. at 58.)

Saunders testified that he "concluded a unit value of $170.00/SF for the subject property (with no consideration given to the subject's specialized interior improvements constructed by Rockwell Collins) which when multiplied by the subject's 124,450 SF GLA is an indicated market value of $21,156,500. (*Id*. t 59.)

Herman testified that his "diligent search of the marketplace revealed several meaningful flexible occupancy industrial building market comparisons * * *." (Def's Ex A at 45.) He selected six sales that closed from August 2008 to December 2009. (*Id*. at 46.) When asked why he selected sale dates after the assessment date, Herman responded that there was "no data to measure as of January 1, 2009," and using data after that date means that "we no longer have to guess" and the "market trends are confirmed." Herman asked about the "comparability" of his

selected six sales to the subject property given that the subject property was built in 2008 and all of the selected sales were built in 1980s and 1990s, and four of the six were "multi-tenant flex" whereas the subject property is "single tenant flex." Herman responded that adjustments for age and other differences or factors were all "qualitative." The "floor area" of the six properties ranged from 42,440 square feet to 169,998 square feet. (*Id.*) The unadjusted sale price per square foot ranged from $91.32 to $150.80. (*Id.*) Plaintiff pointed out, and Herman agreed, that if the sales after 2009 are "taken out" the range of price per square foot is $114.62 to $150.80 and the capitalization rates are 7.2 percent, 8.0 percent and 8.25 percent. (*See id.*)

After giving a brief overview of each of the selected properties, Herman testified that the most comparable property to the subject property was a "single tenant" occupied building at the "time of the purchase" that was "constructed in 1984 and substantially renovated in 2003." (*See id.* at 49.) In his appraisal report, Herman wrote that this property "was not actively exposed to the marketplace and was negotiated as a sale and leaseback agreement through broker solicitation." (*Id.* at 49.) Herman provided the following additional information:

> "The nominal sale price was $5,750,000 with the purchaser paying an additional $150,000 in brokerage commission. The lessee subsequently failed with the property being placed back on the market at an asking price of $150/SF in late March, 2009. It is also being offered as a lease opportunity at $12/SF (absolute net)."

(*Id.* at 50.) Herman concluded that after giving "all considerations, with particular emphasis upon market conditions, it is the appraiser's opinion and conclusion that the market value of the subject property fee simple title as of January 1, 2009 would be competitive as $130/SF or $16,178,500 based upon a gross floor area of 124,450 square feet." (*Id.* at 51.)

/ / /

/ / /

/ / /

3.    *Income Approach*

Saunders testified that the subject property is an income producing property that was leased to one tenant at the time of assessment. Saunders recapped the subject property's existing lease agreement:

> "The subject is fully occupied by Rockwell Collins Aerospace and Electronics, Inc. beginning September 1, 2008 for a period of ten years and eight months. There are two five year options to renew. The tenant received eight months free rent. The effective rent for the subject property is $12.89/SF ($133,687.96/mo.) on a triple net expense basis, if the eight months free rent is adjusted equally over the term of the lease. * * *. The average effective rent over the lease term is $14.52/SF."

(Ptf's Ex 1 at 60-61.) Herman concluded that the "net effective rent including the build-out concession [for the subject property] was $11.20/SF per year." (Def's Ex A at 52.)

a.    Potential Gross Income

In his appraisal report, Saunders wrote:

> "For lease comparison purposes the subject property is compared to other lease comparables based on a gross leasable area of 124,450 SF with 40% office and 60% manufacturing, testing, distribution and production areas which are finished. In this approach to value no additional value is considered for the specialized improvements completed by Rockwell Collins for their specific use, ie produce development, testing and manufacturing of aerospace and electronic circuitry for military and commercial uses.
>
> "* * * * *
>
> "A search was conducted to locate leases which were similar in location, date the lease was signed, and being similar in physical features to the subject property. * * *. There are a limited number of single tenant flex type R & D properties which are leased in the state of Oregon. Therefore, the appraiser utilized additional lease information on flex type R&D properties in California and Nevada to compare to the subject property. The leases were reviewed and verified and the four most comparable leases and one listing were included for further analysis and are set forth on the second following page."

(Ptf's Ex 1 at 60.) The four comparable leases selected were two properties located in Wilsonville, Oregon, (including the subject property), one property located in Las Vegas,

Nevada, and one property located in San Jose, California. (*Id.* at 62.) According to Saunders, the available lease area ranged from 25,875 square feet to 141,620 square feet with effective rent per square foot ranging from $12.72 to $18.00. (*Id.*) The "Start Date" for the four leases ranged from June 2007 to September 2008, the latest being the subject property, and the lease term was ten years for each of the selected properties. (*Id.*) Saunders concluded that even though the "best indicator of market rent for the subject property" is the subject property's existing lease, "which indicates a rental rate of $12.89/SF[,]" * * * "[g]ood support is provided for a market rent for the subject property of $13.00/SF in comparison, which when multiplied by the subject's gross leasable area of 124,450 GLA is a potential gross income estimate of $1,617,850." (*Id.* at 67.)

In response to questions, Saunders testified that the parties "executed their lease agreement in November 2007." Peterson testified that November 2007 was the "zenith of the market." Herman described the market conditions at January 1, 2009, as "apocalyptic." The parties dispute whether financing was available for new construction. (Ptf's Ex 8.)

Saunders testified that the lease rent rate would have been "higher" if the property owner paid for the total tenant improvement build-out costs, totaling "over $7 Million." In response to how Saunders could determine a lease rent rate in excess of the average rent ($12.35) of the comparable properties, Saunders testified that because of the "build out costs," he concluded that the "$12.89 effective rent" is a "low indication of rent." Defendant presented Saunders with a "flyer" for a "flex office" building "under construction" that is located adjacent to the subject property. (Def's Ex C.) According to the flyer and Peterson's testimony, the lease rate offered was $9.90 per square foot for a triple net lease and $20 per square foot for tenant improvement. (*Id.*) Saunders testified that the "flyer is undated" and that he knows that

currently that building is being marketed for a "lease rent rate of $17.90 per square foot and $45 per square foot for tenant improvements." He also testified that a "listing is not a good indication" and he places more reliance on "consummated leases." Saunders testified that he "looked at a lot of data" and did not "see that leases were showing a significant reduction between July 1, 2008, and January 1, 2009," but rather that "rents were flat."

Peterson testified that after August 2008, "three transactions failed," "20 to 30 percent less transactions were being negotiated," and "no leases [were] done" in early 2009. In response, Plaintiff offered its Exhibit 9, Portland Industrial Market, Inventory & Development, Select Top Under Construction Properties, Year-End 2008 – Portland, listing 15 construction projects of varying sizes that were under construction with "delivery dates" in the first quarter 2009. Herman was questioned about various market reports. (*See* Def's Ex A at 163-169.)

Peterson testified that in his opinion, as of January 1, 2009, the market was not at "$13 per square foot triple net." Peterson testified that the "Wilsonville market had higher vacancy rates than Portland" because that area was the "laggard in the I-5" corridor. Peterson was asked about the "Hollywood Video" building located across Interstate 5 from the subject property and that was described as a "rival building" to the subject property. Peterson testified that as of December 2008, the "asking rent" was $12.00 per square foot and subsequently the building went "back to the lender" who is now "asking $9.50 per square foot" with a "$30 per square foot tenant improvement allowance."

Herman selected four leased properties, all located in Hillsboro, Oregon. (Def's Ex A at 54.) In his appraisal report, he wrote:

> "The defining elements of comparability were space similarity to the subject as to
> functionality, quality, size of space leased and expense structure. * * *. Leases
> for similar flexible occupancy industrial space are universally negotiated on an
> absolute net basis wherein the tenant is responsible for all costs of occupancy less

management and structural reserves. Additionally, this type of space is typically negotiated on a blended rate basis as opposed to aggregating shell and office components."

(*Id*. at 52.) For the four properties selected by Herman, the "Area Leased" ranged from 28,482 square feet to 75,010 square feet, and "Effective Rate" ranged from $10.20 per square foot to $11.04 per square foot, with two of the properties not having a "Build-Out Allowance" because the tenants were renewing existing leases. (*Id*. at 54.) The "Start Date" for the four leases ranged from January 2008 to January 2009, with the lease term ranging from one year to six years. (*Id*.) Herman concluded a "Total Base Rent" of $1,368,950 at $11.00 per square foot. (*Id*. at 58.)

> b.    Vacancy and Collection Loss

The parties disagreed as to the appropriate vacancy and collection loss. Saunders wrote in his appraisal report:

> "In the Wilsonville sub-market the vacancy rate for industrial property was 8.7% at the end of 2008. Flex/R&D space had a 7.1 vacancy rate at the end of 2008 in the sub-market in which the subject property is located. * * *. Historical vacancy rates have ranged between 5% and 12% over the previous three years. Considering that the subject property is well located, new, good quality, with no functional inadequacies, a stabilized 5% vacancy and collection loss factor will be applied to the subject property.
>
> "When 5% is multiplied by $1,617,850 potential gross annual income, the indicated vacancy and collection loss reserve for the subject property is $80,893 per year. The effective gross annual income is estimated to be $1,536,957."

(Ptf's Ex 1 at 67.)

Herman testified that he relied on "surveys" from three difference sources reporting space available to lease in comparison to total lease space for the "Southwest I-5 Flex/Industrial Market." (*See* Def's Ex A at 57.) He concluded that:

> "[b]ased upon this statistical data, it would appear that there is a general consensus as to a 9 percent to 12 percent ambient vacancy rate as of the valuation date. * * *. [I]t is the appraiser's opinion and conclusion that a prudent investor

would factor a minimum vacancy and turnover allowance of 10 percent. * * *.
[T]he budgeted revenue loss interval would be equivalent to approximately one
year per ten year period (10%)."

(*Id*. at 57.)  Plaintiff questioned Herman about his vacancy and collection loss percentage,

directing his attention to a report by Colliers International, *The Market Report*, for the fourth

quarter 2008, stating that "Flex Market, I-5 South" vacancy rate was 5.2 percent.  (Ptf's Ex 6 at

4.)

### c.    Annual Operating Expenses

The parties agree that the subject property "is a single tenant triple net leased type

property where most expenses are paid for by the tenant."  (Ptf's Ex 1 at 68.)  In his appraisal

report, Saunders wrote that "[t]wo exceptions are Professional Management which typically runs

1% and reserves for replacement which can range from 1-2% of effective gross income, a 3%

estimated annual operating expense will be utilized in this analysis."  (*Id*.)  In his appraisal

report, Herman wrote, "Therefore, the only non-recoverable expenses are executive

management, structural reserve ["2% EGI"] and turnover reserve ["2% EGI"]."

(Def's Ex A at 57, 58.)  Herman computed a "Turnover Budget" of $1,016,679, including a

"Build-Out Allowance ($5/SF 2nd Generation)," "One Month Free Rent Move-in," "Preservation

Utilities During Lease-up (1 year)," "Leasing Commission (5%/3 year cap)," and "Insurance,

Taxes During Lease-up."  (*See id*. at 57.)  In his appraisal report, Herman stated that the

computed turnover budget was discounted "at a 3 percent safe rate for the 10 year initial turnover

period," resulting "in a line item expense of $88,685."  (*Id*.)  "Executive management has been

estimated at 2 percent of collected revenue, as has structural reserves based upon survey results

published in the first quarter 2009 *Korpacz Real Estate Market Survey*."  (*Id*.)

/ / /

Herman was questioned about his computed "Turnover Budget." Quoting from Appraising Industrial Property (2005), Plaintiff asked Herman about "above the line" and "below the line" expenses, questioning, whether it is acceptable to "use tenant expenses that appear below the line when computing net operating income." Herman testified that given the terms of the subject property's lease, specifically that the tenant has no obligation "to tear out its improvements" and the "ten year term," it becomes a "critical responsibility" for the property owner, and should be considered a cost of operation. Peterson testified that "re-tenanting is a huge cost," and estimating that cost is an "art, there is no formula." Plaintiff pointed out that in the Appraisal Institute, *The Appraisal of Real Estate* at 480 (13th edition 2008), states that "re-tenanting" and lease commissions should not be "considered" part of operating expenses. Herman testified that if the "lease-up expenses" are excluded then the "cap rate would be higher."

d.      Net Operating Income

After determining potential gross income, vacancy and collection loss, and annual operating expenses, the parties determined net operating income. Saunders determined a "Net Annual Operating Income" of $1,490,848. (Ptf's Ex 1 at 68.) Herman determined an "Estimated Net Operating Income at Stabilization" of $1,094,088. (Def's Ex A at 58.)

e.      Capitalization Rate

In determining an "overall capitalization rate," Saunders testified that he "abstracted overall rates from three comparable sales in the prior sales comparison approach, which were leased at the time of sale." (*See* Ptf's Ex 1 at 68.) He testified that the "overall rates range[d] from 7.38 to 7.75%." (*Id*.) Saunders concluded that the applicable capitalization rate was 7.25 percent, stating that the subject property is a "larger better quality light industrial R&D property which is new and well located" and "is superior to all the comparable sales cited above." (*Id*.)

Herman testified that the "market capitalization rate range reflected by the comparables cited in the Sales Comparison Approach was 7.2 percent to 9.46 percent." (Def's Ex A at 58.) In his appraisal report, Herman wrote:

> "The *Korpacz Real Estate Market Survey* of flex/R&D rate of return expectations relative to the first quarter of 2009 was a range of 7.0 percent to 10.0 percent. Due to the age, quality and location of the subject, it is the appraiser's opinion and conclusion that the subject property would be competitive in the marketplace at a 7.75 percent capitalization rate."

(Def's Ex A at 58.) Herman was questioned about using data from the "first quarter of 2009" rather than the "fourth quarter 2008" and responded that "risk was rising in the first quarter of 2009."

### f. Income Approach Value Estimate

Saunders testified that, "When the estimated net annual operating income of $1,490,848 is divided by an overall capitalization rate of 7.25%, the indicated market value of the fee simple interest in the subject property as of January 1, 2009 is $20,563,421." (*See* Ptf's Ex 1 at 68.)

Herman testified that based on his estimate of the subject property's net operating income, $1,094,088, and capitalizing that net operating income at seven and three quarters percent, "The resulting value estimate based upon the Income Approach has therefore been calculated at $14,117,250 * * *." (*See* Def's Ex A at 58.)

### C. *Reconciliation of Approaches and Determination of Real Market Value*

Saunders testified that he placed "primary weight" on the income approach, "which indicated a market value estimate of the fee simple interest in the real property as of January 1, 2009 of $20,563,421." (*See* Ptf's Ex 1 at 70.)

Like Saunders, Herman testified that he placed "Primary emphasis * * * upon the Income Approach value indication." (*See* Def's Ex A at 60.) He explained that the sales comparison approach was "utilized to test the reasonableness of the Income Approach value estimate based

upon price per square foot[,]" and the "Cost Approach serves to credibly establish an upper value threshold due to market conditions which have severely impacted the financial feasibility of development and financing availability." (*Id*.) Herman concluded "a value estimate of $15,000,000 as of January 1, 2009." (*Id*.)

D.     *Use Value: Tenant Leasehold Improvements*

The parties disagree as to whether the "tenant leasehold improvements have * * * measurable contributory value to the fee ownership." (Def's Ex A at 59.) Herman testified that "inasmuch as all [tenant leasehold improvements] are unique to the tenant and will likely not be of functional benefit to any other tenant" and "the tenant may remove or leave any or all of the leasehold improvements" or "ownership may have to assume the cost burden of removal at lease termination which could well exceed any salvage value associated with the leasehold improvements" there is "no value" to subject property. (*Id*.)

Plaintiff offered the Declaration of Debra Cobun, controller for Perlo McCormack Pacific Company, stating that the subject property's tenant, Rockwell Collins, was invoiced and paid $7,401,742.42 for tenant improvements completed as of December 30, 2008. (Ptf's Dec of Debra Cobun, Oct 10, 2011.) The declaration stated that, "This amount, $7,401,742.42, does not include any cost of the building shell, which was paid for under a separate contract by Jack Martin, of Wilsonville 2006 NW LLC." (*Id*.)

Saunders testified that in addition to the tenant improvement allowance of $35.30 per square foot stated in the Lease Agreement (Ptf's Ex 1, specifically at 124) the tenant [Rockwell Collins] spent an additional $3,045,992 and those costs were part of the amount stated on the December 30, 2008, invoice. Saunders testified that because the tenant "spent an additional $3,045,992 on specialized tenant improvements to develop the interior of the building for a

specific use[,] * * * the use value of the real property to Rockwell Collins is much higher than the market value to an alternate user." (*See id*. at 10.) Saunders was questioned at length as to "how the use value" determines "real market value" for the subject property where the owner is not the user. He testified that the "special improvements add value to the enterprise," Rockwell Collins, even though the "improvements belong to the owner." Saunders testified that the "typical investor would not place any value on these specialized improvements and would anticipate remodeling the building interior for an alternate user." (*Id*.) To the real market value he determined, Saunders added the cost ($3,045,992) he computed was paid by the tenant in excess of the tenant improvement allowance stated in the lease agreement to conclude a "use value estimate." (*Id*. at iv, 69, 70.) Saunders testified that the "Appraisal Institute" recognizes the use value approach when there is a "specific use or specialized use."

## II. ANALYSIS

The issue before the court is the 2009-10 real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[2] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to year 2009.

found to not be applicable. *See* ORS 308.205(2) and OAR 150-308.205-(A)(2)(a). Each party determined the subject property's real market value using the three valuation approaches.

A.     *Cost Approach*

Using the cost approach, Herman determined that the subject property's real market value as of the assessment date was $16,189,000 (rounded). (Def's Ex A at 59, 147.) Herman testified that he did not include the cost of tenant improvements paid by the tenant that were in excess of the amount to be paid in accordance with the lease agreement by the property owner for tenant improvements. That is contrary to accepted appraisal standards: "Tenant finish costs may also be necessary to achieve stabilized occupancy and, if so, they must be added as a direct cost." Appraisal Institute, *Appraisal of Real Estate* at 382 (13th Ed 2008). Saunders submitted evidence stating that the additional costs in the amount of $3,045,992 were paid for tenant improvements by the tenant. (Ptf's Ex 1 at 10.) Those costs should have been included in Herman's determination of real market value, resulting in a total (land and improvement) real market value of approximately $19,235,000. Herman testified that he placed no reliance on the cost approach.

Saunders testified that based on appraisal reports prepared by fee appraisers who were not Plaintiff's employees, he concluded the subject property's total real market value was $23,000,000. Unfortunately, those fee appraisers did not testify. Defendant and the court were not given the opportunity to question those individuals. The court will not rely on Saunders's estimate of real market value, which is based primarily on work done by others who did not testify.

Given the testimony and evidence, the court will give no consideration to the parties' determination of the subject property's real market value using the cost approach.

B.    *Comparable Sales Approach*

Both appraisers relied on the comparable sales approach to check the "reasonableness" of the income approach value.  (Ptf's Ex 1 at 70; Def's Ex A at 60.)  The comparable properties selected by the appraisers were described as primarily "multi-tenant flex," although two of Herman's six comparable properties were "single tenant flex" and two of Saunders five comparable properties were "office buildings."  (Ptf's Ex 1 at 50; Def's Ex A at 46.)  Saunders included a property listed for sale, noting an asking price per square foot of $175.  (Ptf's Ex 1 at 51.)  Even though that property is similar in size to the subject property, it was built in 1980 and remodeled in 1998, and most important, that property was still listed for sale as of the trial date, providing little evidence of value for the subject property.  (*Id*.)  The sale dates of Saunders's comparable properties were January 2006, March 2006, November 2007, May 2008, and June 2008 with three of the five sales clustered around $160 per square foot with the two "office buildings" having a price per square foot in excess of $200.  (*Id.* at 50.)  Saunders "concluded a unit value of $170.00/SF for the subject property (with no consideration given to the subject's specialized interior improvements constructed by Rockwell Collins) which * * * is an indicated market value of $21,156,500."  (*Id.* at 59.)

In contrast, the sale dates of Herman's comparable properties were August 2008, December 2008, February 2009, October 2009, and December 2009.  (Def's Ex A at 46.)  Giving little significance to the sales completed after the assessment date, the price per square foot for three comparable properties ranged from $115 (rounded) to $151 (rounded) per square foot.  (*Id*.)  Herman concluded "that the market value of the subject property fee simple title as of January 1, 2009 would be competitive at $130/SF or $16,178,500 * * *."  (*Id*. at 51.)

/ / /

Saunders's comparable sales clustered around $160 per square foot. (Ptf's Ex 1 at 50.) Herman's computed price per square foot ($130) is within the range of comparable sales. (Def's Ex A at 51.) Sales after the assessment date ($91 to 112 (rounded)) support a price per square foot less than the high end of the range. (*Id.* at 46.) Saunders did not include comparable sales after June 2008, a full six months prior to the assessment date, even though there are sales after that date and before the assessment date. (Ptf's Ex 1 at 50.) Sales after June, 2008, reflect the market conditions as of the assessment date and should have been considered by Saunders. Given the subject property's location and age and the evidence, the court concludes that $140 per square foot is reasonable, resulting in a real market value of $17,423,000.

C.    *Income Approach*

The income approach is defined by Herman as "an appraisal process that converts anticipated benefits derived from the ownership of income producing property into a value estimate." (Def's Ex 1 at 52.) Saunders offered a similar definition: "The income approach measures the value of an income producing property based on the property's income producing ability." (Ptf's Ex 1 at 60.) The income approach was given "primary emphasis" by Plaintiff and Defendant in determining the subject property's real market value. (Ptf's Ex 1 at 70; Def's Ex A at 60.) The appraisers did not agree on any of the income approach components: gross revenue, vacancy rate, expenses, or capitalization rate. (Ptf's Ex 1 at 68; Def's Ex A at 58.)

1.    *Potential Gross Income*

Beginning with gross income, both appraisers undertook a search to locate leases that "were similar in location, date the lease was signed, and being similar in physical features to the subject property." (*See* Ptf's Ex 1 at 60.) Saunders extended his search to Nevada and California. (*Id.*) He determined that the two leases outside Oregon had an effective rent, per

square foot per month, of approximately $18. (*Id*. at 62.) In contrast, the other three lease comparables, the subject property, a one-story office/warehouse in Wilsonville and a listing in Wilsonville, all had effective rents of $12 to $13. (*Id*.) Ultimately, Saunders concluded that the "best indicator of market rent for the subject property is lease #1 [the subject property], which indicates a rental rate of $12.89/SF." (*Id*. at 67.) Herman selected lease comparables from four properties located in Hillsboro, Oregon. (Def's Ex A at 54.) The effective rent per square foot ranged from $10.20 to $11.04. (*Id*.) Herman concluded a "base rent" of "$11.00/SF," testifying that a lower rate than the subject property's lease agreement rate was appropriate because the subject property's lease was negotiated months prior to the assessment date. (*See id*. at 58.) Given the evidence and testimony, the court concludes that the effective rent, per square foot per month, is $12. The total potential gross annual income is $1,493,400.

2.      *Vacancy Rate*      .

Looking next to "vacancy and collection loss" that is described as the "vacancy period between tenants," Saunders's report stated that Historical vacancy rates have ranged between 5% and 12% over the previous three years." (Ptf's Ex 1 at 67.) Without stating the source of his historical data or identifying the vacancy rate by year, Saunders concluded that because "the subject property is well located, new, good quality, with no functional inadequacies, a stabilized 5% vacancy and collection loss factor will be applied to the subject property." (*Id*.) Herman's report stated that according to three sources (Norris, Beggs & Simpson; Grubb & Ellis; and CBRE) the vacancy rate for "Southwest I-5 Flex/Industrial Market Vacancy Survey (January 1, 2009)" ranged from 9.5 percent to 12.95 percent. (Def's Ex A at 57.) He concluded "that a prudent investor would factor a minimum vacancy and turnover allowance of 10 percent." (*Id*.) Saunders's report stated that "[f]lex/R&D space had a 7.1% vacancy rate at the end of 2008 in

the sub-market in which the subject property is located." (Ptf's Ex 1 at 67.) He did not cite the source. Given Saunders's failure to provide the source of his data or to substantiate his conclusion that a vacancy rate at the low end of a three year period for an unidentified location is reasonable, the court accepts Herman's vacancy rate of 10 percent.

3. *Operating Expenses*

Saunders and Herman agree that because the subject property "is a single tenant triple net leased type property where most expenses are paid for by the tenant," operating expenses are limited to professional or executive management and reserves for replacement or structural reserves. (*See* Ptf's Ex 1 at 68; Def's Ex A at 58.) Saunders concluded "a 3% estimated annual operating expense," and Herman concluded a four percent estimated annual operating expense. (*Id.*) Neither party provided source detail for his conclusion. The court accepts Saunders's determination that operating expenses should be computed as three percent of effective gross income.

In addition to the operating expenses discussed above, Herman concluded that an additional operating expense identified as a turnover reserve was appropriate "assuming a ten-year turnover interval * * *." (Def's Ex A at 57.) For the turnover reserve, Herman identified the following costs: "Build-Out Allowance," "One Month Free Rent Move-in," "Preservation Utilities During Lease-up (1 year)," "Leasing Commission," "Insurance, Taxes During Lease-up." (*Id.*) In addition to assuming a ten year turnover interval, Herman discounted the computed turnover budget "at a 3 percent safe rate for the 10 year initial turnover period" to compute "a line time expense of $88,685." (*Id.*) The court acknowledges that the subject property's tenant signed an initial ten year lease with two five year renewal options. (Ptf's Ex 1 at 60.) Herman concludes that if the subject property's current tenant fails to exercise its options or vacates the

premises the next tenant will also be a 10 year tenant. The court finds no factual basis for that assumption. In addition, the court finds the costs detailed in the turnover reserve to be speculative. The court does not consider the turnover reserve to be a quantifiable operating cost.

4.    *Capitalization Rate*

The final component in determining real market value using the income approach is the capitalization rate. Saunders's "abstracted overall rates from three comparable sales in the prior sales comparison approach, which were leased at the time of sale." (Ptf's Ex 1 at 68.) He stated that the "overall rates range from 7.38 to 7.75%." (*Id.*) Saunders concluded that because the property was "a larger better quality light industrial R&D property which is new and well located [it] would likely sell at a capitalization rate of 7.25% in comparison as it is superior to all the comparable sales cited above." (*Id.*)

In addition to the capitalization rates, ranging from 7.2 percent to 9.46 percent and were extracted from the sales used in his sales comparison approach, Herman considered the "*Korpacz Real Estate Market Survey* of flex/R&D rate of return expectations relative to the first quarter of 2009," showing "a range of 7.0 percent to 10.0 percent." (Def's Ex A at 58.) Herman ultimately concluded a capitalization rate of 7.75 percent. (*Id.*)

In selecting a capitalization rate outside the range of capitalization rates computed for his comparable properties, Saunders discounts the comparability of the properties he selected, leaving the capitalization rate unsupported by the evidence. Herman selected a capitalization rate at the low end of the overall rates computed for his comparable properties. The court concludes that Herman's capitalization rate is adequately supported by the evidence and accepts a capitalization rate of 7.75 percent.

/ / /

Using a gross annual income of $1,493,400 reduced by a 10 percent vacancy factor and operating expenses of three percent, the net operating income of $1,299,258 is capitalized by seven and three quarters percent to determine a real market value of $16,764,619.

### III.  CONCLUSION

Based on careful review of the evidence and testimony, the court concludes that primary emphasis is given to the income approach supported by the sales comparison approach.  The court determines a real market value for the subject property as of the assessment date, January 1, 2009, of $17,000,000.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of property identified as Account 05005691 is $17,000,000.

Dated this ____ day of December 2011.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on January 11, 2012.  The Court filed and entered this document on January 11, 2012.*